M.A.P. OIL COMPANY, INC., a California corporation, d/b/a Amendt Oil Company; A.W. Laughton, an individual; Bob Mitchell, an individual; T.B. Smith Company, Inc., a California corporation; Steuben Petroleum, Inc., a California corporation; McWhirter Distributing Company, Inc., a California corporation; Louis V. Colombani, an individual; Cook & Cooley, Inc., a California corporation; Ernst Enterprises, Inc., a California corporation; W. C. Goolsby, Inc., a California corporation; Polpet, Inc., a California corporation; Ernst Distributing Inc., a California corporation; L.A. Calleri, an individual, d/b/a Calleri Oil Company; J.E. DeWitt, a California corporation, Plaintiffs-Appellants,

v.

TEXACO INC., a Delaware corporation, Defendant-Appellee.

No. 80–4259.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 8, 1982.

Filed Nov. 9, 1982.

Rehearing and Rehearing En Banc Denied Jan. 10, 1983.

**1304**

David M. Zeff, Froneberger, Bonner & Zeff, San Francisco, Cal., for plaintiffs-appellants.

* The Honorable William J. Jameson, Senior United States District Judge, District of Montana, sitting by designation.

1. Prior to trial, the district court entered partial summary judgment for Texaco on the regulatory claims. Plaintiffs appealed that judgment to the Temporary Emergency Court of Appeals.

David A. Luttinger, White Plains, N.Y., argued, for defendant-appellee; Eric Watt Wiechmann, Cummings & Lockwood, Stamford, Conn., on brief.

Before KILKENNY and ANDERSON, Circuit Judges, and JAMESON,* District Judge.

J. BLAINE ANDERSON, Circuit Judge:

This action was filed by twenty-five wholesale gasoline distributors and commission agents, alleging antitrust and regulatory violations by Texaco Inc. ("Texaco") in the marketing of Texaco gasoline. The regulatory claims allege violations of the Mandatory Petroleum Allocation and Price Regulations, 10 C.F.R. §§ 210–12, promulgated under the Emergency Petroleum Allocation Act of 1973. 15 U.S.C. §§ 751–760h. The antitrust claims allege actual and attempted monopolization under § 2 of the Sherman Act. 15 U.S.C. § 2. This appeal by fourteen of the plaintiffs from an adverse directed verdict concerns only the Sherman Act § 2 claims.[1]

Texaco is a major national corporation involved in all phases of the petroleum industry, from production of crude oil through retailing of gasoline and other refined petroleum products. Its customers fall into three categories or classes of trade. The "retailer" category is composed of numerous independent businessmen who purchase Texaco gasoline from Texaco and resell it to motorists through Texaco service stations. Texaco also sells gasoline directly to a "commercial consumer" class of trade, the members of which consume the gasoline in their own businesses. Taxi fleets and

*McWhirter Distributing Co. v. Texaco Inc.,* 668 F.2d 511 (Em.App.1981).

Various pendent state claims, together with counts brought under the Clayton Act, the Robinson-Patman Act, and § 1 of the Sherman Act, were abandoned on appeal per stipulation of the parties filed March 19, 1982.

agricultural accounts are examples of commercial consumers. The third category consists of "independent wholesale distributors" who purchase gasoline from Texaco for resale to their own customers.

Five of the plaintiffs fall into the third category described above. They are independent wholesale distributors who, for several years, purchased gasoline from Texaco at a distributor level price (referred to as distributor tankwagon or "DTW"). The remaining plaintiffs fall into none of the classes described above. They are consignees or tank truck dealers (collectively referred to as "commission agents") who neither bought nor sold gasoline but were paid a commission by Texaco based on the number of gallons they delivered to retail dealers. Although plaintiffs emphasize on this appeal that they provided additional significant "distribution services" other than the simple delivery of gasoline, the primary function of both distributors and commission agents was to deliver Texaco gasoline to retailers.

Texaco also delivers its gasoline directly to retail dealers. This method of delivery is performed by salaried Texaco employees. Texaco retailers who receive direct deliveries pay a retail tankwagon ("RTW") price, as opposed to the DTW charged independent distributors. Because distributors and commission agents offered discounts and allowances to certain high-volume retailers, the price to the retailer for a gallon of Texaco gasoline varied throughout the relevant region.

In January, 1977, Texaco instituted a price increase on all sales of its gasoline. While the RTW increased only ½ cent per gallon, the DTW increased 1 cent for regular gasoline and 1½ cents for premium. The commission agents were affected by a ½ cent per gallon decrease in commissions for deliveries of Texaco gasoline. It is this unequal price and commission change—an action which had the effect of shaving the distributors' and commission agents' competitive pricing edge in favor of Texaco's directly delivered operations—that formed the basis for plaintiffs' claims.

Plaintiffs' complaint asserted two Sherman Act § 2 violations. First, plaintiffs contended that Texaco possessed a practical monopoly over the sale of Texaco brand gasoline; that plaintiffs competed with Texaco in a separate market consisting of "distribution services" of the gasoline; and that Texaco used its monopoly power in the first market—sales—to gain a competitive advantage in the second market—distribution services. Second, plaintiffs contended that Texaco's pricing actions demonstrated an attempt to monopolize the market for distribution services and wholesaling of Texaco gasoline.

Following some four weeks of trial, Texaco moved for a directed verdict, contending that plaintiffs had failed to present sufficient evidence upon which a reasonable jury could find either a first or a second market. The district court concluded that plaintiffs had presented sufficient evidence of a first market; however, as to the second market, the court concluded:

> [T]he evidence from plaintiffs themselves would not justify a reasonable juror in concluding that distribution services exist as a distinct, separate and second market. Their testimony clearly demonstrates that the "distribution services" were an integral part of the sale of gasoline to retailers and bulk consumers.

The court directed a verdict in favor of defendants, holding that plaintiffs' failure to establish a second market was fatal to both the monopolization and the attempted monopolization theories.

On appeal, plaintiffs contend the evidence of a second market was sufficient for jury assessment and, in any event, that the attempted monopolization claim requires no evidence of a second market. Certain of the court's evidentiary rulings are also asserted as error. We take these issues up in order.

## I. MONOPOLIZATION

Monopolization under § 2 of the Sherman Act can assume a number of forms. Among those forms is the theory that a firm violates § 2 by using its monop-

oly power in one market to gain an unwarranted competitive advantage in another. *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 275–76 (2d Cir.1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980); *Greyhound Computer Corp. v. International Business Machines Corp.,* 559 F.2d 488, 492–97 (9th Cir.1977), *cert. denied,* 434 U.S. 1040, 98 S.Ct. 782, 54 L.Ed.2d 790 (1978). As with any monopolization claim, the proponent of this theory must identify the relevant product and geographic markets[2] as a threshold requirement. *Kaplan v. Burroughs Corp.,* 611 F.2d 286, 291 (9th Cir.1979), *cert. denied,* 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). Moreover, the market identification burden is compounded under this theory because proof of the existence of two separate product or service markets is necessary.

Although the directed verdict was limited to the second market issue and consequently our review is similarly limited, a full understanding of the case requires a brief discussion of the first market as well. A natural reaction to a product market consisting solely of Texaco gasoline is to inquire why plaintiffs did not simply purchase gasoline from other suppliers. Plaintiffs offered evidence that a number of barriers precluded them from switching brands and suppliers. The trial court found that evidence of federal regulations, supply shortages, and preexisting barriers such as brand identification and contractual restraints could convince a reasonable jury that the sale of Texaco gasoline constituted a relevant product market. While we express no opinion on the correctness of that ruling, we will, for purposes of this opinion, assume that the sale of Texaco gasoline could constitute a relevant product market.

■ The central issue is whether a separate or submarket composed of "distribution services" existed apart from the "sale"

market. The district court directed a verdict in favor of Texaco, finding insufficient evidence for jury consideration of a distribution service market. Our standard for determining the propriety of a directed verdict is the same as the district court's. *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 734 (9th Cir.1979). The standard is whether or not, viewing the evidence as a whole and in the light most favorable to the nonmoving party, there is substantial evidence that could support a finding for the nonmoving party. *Id.* After carefully reviewing the record in light of this standard, we affirm the trial court's directed verdict.

■ Market definition can be broadly characterized in terms of the "cross-elasticity of demand" for or "reasonable interchangeability" of a given set of products or services. *United States v. E.I. duPont de Nemours,* 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264, 1281 (1956); *Fount-Wip, Inc. v. Reddi-Wip, Inc.,* 568 F.2d 1296, 1301–02 (9th Cir.1978). "If the product and its substitutes are reasonably interchangeable by consumers for the same purposes, or if they have a high cross-elasticity of demand in the trade, they will be included in the same market . . . ." 3 J. von Kalinowski, *Antitrust Laws and Trade Regulation* § 8.02[2][a], at 16–17 (1982). Reasonable interchangeability emphasizes the economic factors of use and physical characteristics, while cross-elasticity stresses price.

Other economic factors useful in identifying submarkets are "such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 1523–24, 8 L.Ed.2d 510, 535–

---

**2.** The parties do not dispute the boundaries of the geographic market, which they denominate as PADD V. PADD V is an acronym for Petroleum Administration for Defense District V, consisting basically of California, Oregon, Washington, Hawaii, Alaska, Nevada, and Arizona. The United States is divided into five

36 (1962).[3] In *International Telephone and Telegraph Corp. v. General Telephone & Electronics Corp.,* 518 F.2d 913, 932 (9th Cir.1975), we observed that *Brown Shoe's* indicia

> "were listed with the intention of furnishing practical aids in identifying zones of actual or potential competition rather than with the view that their presence or absence would dispose, in talismanic fashion, of the submarket issue. Whether or not a court is justified in carving out a submarket depends ultimately on whether the factors which distinguish one purported submarket from another are 'economically significant' in terms of the alleged anticompetitive effect."

Plaintiffs rely primarily on *Greyhound Computer,* where we found a distinct product market for the lease as opposed to the sale of IBM general purpose computers. That finding was based on the recognition of the computer industry, and its customers, that leases and sales serve different customer needs. The *Greyhound Computer* plaintiffs presented evidence that leases were more flexible than purchases of computers, and that purchases required a commitment of capital for a greater period of time. *Greyhound Computer,* 559 F.2d at 494–95. The *Greyhound Computer* jury could have inferred from the evidence that consumers of computer services could either buy a computer or lease one, and that sale and lease customers seldom shifted back and forth.

■ Plaintiffs attempt a similar analysis in the instant case by listing the alleged customer-recognized differences between plaintiffs' delivery of Texaco brand gasoline over Texaco's direct delivery scheme. For example, plaintiffs contend that only through a distributor or commission agent, or through Texaco, could a customer obtain marketing advice, credit services, equipment loans, real estate improvements, and brand identification and pricing signs,

among other services. We agree that each of these services has some value to the recipient, and that viewed in the abstract under the *Brown Shoe* criteria, they constitute services distinct from the simple delivery of gasoline. These services obviously do not compete with gasoline sales; they are not reasonably interchangeable with the sale of gasoline, nor do they exhibit high cross-elasticity of demand because fluctuations in the price of these services would appear to have little effect on the price of gasoline. Examining the "economic significance" of these services under the facts of this case, however, we agree with the trial court that the services were integral elements of the sale of gasoline.

The concept of a market consists of the activities of buying and selling some product or service. The activities of buying and selling cannot exist without a price for the product or service. Each of the "distribution services" listed by plaintiffs are capable of being performed for a price by other business entities. For example, banks and other financial institutions offer credit, building contractors can be hired to improve real estate, consultants provide marketing advice, sign manufacturers provide signs, and so on. If these services were performed by such business entities, each recipient obviously would pay a price separate and apart from the price paid plaintiffs for gasoline. In the present case, however, the evidence established that plaintiffs' customers negotiated one price for the sale of gasoline, apparently never considering a separate price for these component services. Plaintiffs' prices did not vary if they excluded some or even all service features for particular customers. In short, economic reality suggests that none of plaintiffs' customers *purchased* "distribution services"; instead, those services were essentially marketing techniques designed to either initially obtain or subsequently retain a customer.

---

such districts which conform roughly to the distribution regions of the oil industry.

**3.** Although *Brown Shoe* was a merger case under § 7 of the Clayton Act, the decision pro-

vides indicia generally applicable to Sherman Act § 2 cases as well. *United States v. Grinnell Corp.,* 384 U.S. 563, 572–73, 86 S.Ct. 1698, 1704–05, 16 L.Ed.2d 778, 787–88 (1966).

Nor are the *Brown Shoe* indicia useful in identifying a submarket for distribution services. Those indicia are designed to compare the activities of two sellers to determine if their products or services compete in the same market or trade in separate markets. Since plaintiffs here derived income only from the sale of gasoline and did not sell services separately, there are not two products or services to compare under *Brown Shoe.* Customers can choose between direct delivery of gasoline and delivery through distributors or commission agents, but in the final analysis they purchase a single product—gasoline. We hold, therefore, that the trial court was correct in ruling plaintiffs' evidence of a second market insufficient for jury assessment.

## II. ATTEMPT TO MONOPOLIZE

Plaintiffs' attempt claim is based on the theory that Texaco attempted to monopolize the market for "distribution services." After ruling that insufficient evidence of such a market was presented, the trial court dismissed both the monopolization and attempt claims, observing that "both these contentions require that plaintiffs establish the existence of a second market, though they need not at this stage define that market with 'metes and bounds' specificity." Plaintiffs insist on appeal that proof of the distribution service market was not necessary to the establishment of a prima facie case of attempt. Plaintiffs' argument exhibits a misunderstanding of the law of this circuit.

In *Twin City Sportservice, Inc. v. Charles O. Finley & Co.,* 676 F.2d 1291, 1308 (9th Cir.1982), *petition for cert. filed,* 51 U.S. L.W. 3342 (U.S. Sept. 8, 1982) (No. 82–396), we listed the elements of a § 2 claim of attempt to monopolize:

(a) specific intent to control prices or destroy competition in some part of commerce;

(b) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; and

(c) dangerous probability of success.

As we observed in *California Computer Products, Inc. v. International Business Machines Corp.,* 613 F.2d 727, 737 (9th Cir. 1979), evidence of market power is not an "independent" element of an attempt claim. That observation stemmed from a line of decisions in this court dating back to *Lessig v. Tidewater Oil Co.,* 327 F.2d 459 (9th Cir.), *cert. denied,* 377 U.S. 993, 84 S.Ct. 1920, 12 L.Ed.2d 1046 (1964), where we declared: "When the charge is attempt (or conspiracy) to monopolize, rather than monopolization, the relevant market is 'not in issue.'" *Id.* at 474. More recently, we have refined somewhat that broad statement and have recognized that while evidence of market power is not vital, it may be relevant to suggest the existence of specific intent. *Blair Foods, Inc. v. Ranchers Cotton Oil,* 610 F.2d 665, 669–70 (9th Cir. 1980) ("The real issue in this type of case is one of specific intent to monopolize, and we find nothing in *Lessig* which excludes consideration of market power as one of the circumstances to be considered in determining whether such intent exists."). *See also Janich Bros., Inc. v. American Distilling Co.,* 570 F.2d 848, 853–54 & n. 4 (9th Cir.1977), *cert. denied,* 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); *Hallmark Industry v. Reynolds Metals Co.,* 489 F.2d 8, 12–13 (9th Cir.1973) ("evidence of market power may be relevant, but it is not indispensable where a substantial claim of restraint of trade is made"), *cert. denied,* 417 U.S. 932, 94 S.Ct. 2643, 41 L.Ed.2d 235 (1974); *Bushie v. Stenocord Corp.,* 460 F.2d 116, 121 (9th Cir. 1972).

*Bushie,* in particular, provides guidance on this issue. In that case, plaintiffs were engaged in selling and servicing office dictating machines under a distributorship contract with Stenocord. Plaintiffs brought suit after Stenocord terminated their distributorship contract and began selling and servicing through its own outlet exclusively. Citing *Lessig* and *Industrial Building Materials, Inc. v. Interchemical Corp.,* 437 F.2d 1336 (9th Cir. 1970), plaintiffs contended that intent was the sole essential element of an attempt claim, and that no showing of Stenocord's power to

monopolize the market was required. We noted that in both *Lessig* and *Industrial Building* the attempted monopolization claim was founded upon a substantial claim of restraint of trade, from which the specific intent required for an attempt claim could be inferred. We held the *Bushie* plaintiffs had failed to establish such a foundation.

Similarly, in *Gough v. Rossmoor Corp.,* 585 F.2d 381 (9th Cir.1978), *cert. denied,* 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979), an action claiming attempt to monopolize was brought against a retirement community newspaper that refused to accept carpet advertisements from dealers outside the retirement community. Over plaintiffs' insistence that proof of relevant market was unnecessary to their attempt claim, we held:

in the absence of proof of relevant market and market power, the plaintiff must prove either predatory conduct or a *per se* violation of § 1 to prove an attempt to monopolize. Without these limitations the door to a § 2 attempt would be open far wider than necessary to meet the concerns expressed by this court in *Greyhound Computer, supra,* and could permit treble damage recovery where no remote possibility of monopolization would appear to exist and where the impact on competition of the conduct in question is limited to its impact on the plaintiff.

*Id.* at 390 (footnotes omitted).

 We believe *Bushie* and *Gough* essentially dispose of this issue. While *Lessig* and its progeny do not require proof of market power to establish a claim of intent to monopolize, under the facts of this case we agree with the trial court that failure to define the relevant market was fatal to plaintiffs' attempt claim. We are not persuaded that Texaco's price increases and commission reductions constitute predatory conduct or a "substantial claim of restraint of trade." An increase in the cost of doing business to those who deliver Texaco gasoline is hardly the type of "clear threat to competition" that would state a claim under § 2 without some idea of the market within

which plaintiffs are functioning. *See Janich Bros., Inc.,* 570 F.2d at 853–54 & n. 4 (9th Cir.1977).

Plaintiffs argue that *Greyhound Computer* compels an opposite result. In that case we discussed the proof necessary for a plaintiff to avoid a directed verdict on an attempt claim, and we explained that if the evidence established IBM's specific intent and predatory conduct, the attempt claim could go to the jury absent definitive proof of a specific economic market. *Greyhound Computer,* 559 F.2d at 504. We concluded:

"If proof of an economic market, technically defined, and proof of a dangerous probability of monopolization of such a market were made essential elements of an attempt to monopolize, as a practical matter, the attempt offense would cease to have independent significance."

*Id.*

When examined in context, it is apparent that the foregoing passage was part of a discussion of the law in this circuit allowing inferential or circumstantial proof of the elements of attempt claims. *Greyhound Computer* agreed with prior Ninth Circuit law which allows certain elements to be inferred from market power, or allows those elements to be directly proved absent technically complete proof of market power. We do not read *Greyhound Computer* as dispensing with the concept of market altogether in attempt claims, and we believe under the instant facts that an attempt violation could not be established without at least something approaching a relevant market. The attempt element of specific intent to control prices or destroy competition cannot exist in a vacuum. Without some framework within which the activities of competition and pricing take place, whether that framework be called a market or some other name, Texaco could never have "specific intent to control prices or destroy competition." This case is devoid of even that bare framework, and therefore we agree with the trial court's dismissal of plaintiffs' attempt claim.

## III. EVIDENTIARY RULINGS

Plaintiffs assert as error the district court's exclusion of evidence concerning Texaco's alleged regulatory violations and baseless appeals under the Emergency Petroleum Allocation Act of 1973. Our review of rulings on evidence is limited to abuse of discretion, even in the context of appeals from a directed verdict. *Greyhound Computer*, 559 F.2d at 508. We find no abuse of discretion in the trial judge's handling of the disputed evidence. Our review of the record reveals the excluded evidence was only remotely related to plaintiffs' antitrust claims. The relevance of the evidence to plaintiffs' regulatory claims will be considered on remand from the Temporary Emergency Court of Appeals.

AFFIRMED.