791 F.2d 1343
 55 USLW 2010, 1986-1 Trade Cases 67,177
 Lawrence Clare CATLIN, d/b/a Heatsavers of Puget Sound, and
James C. Fry, James A. Fry, Plaintiffs-Appellants,
v.
WASHINGTON ENERGY COMPANY, a Washington corporation;
Washington Natural Gas Co., a Wholly Owned Subsidiary of
Washington Energy Company; Thermal Energy, Inc., a Wholly
Owned Subsidiary of Washington Energy Company, Defendants-Appellees.
 No. 85-3570.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted March 5, 1986.
Decided June 13, 1986.
 
 Katherine Koehler, Lopez & Ackerman, Seattle, Wash., for plaintiffs-appellants.
 Thomas C. Armitage, Frank Birkholz, Cartano, Botzer, Larson & Birkholz, Seattle, Wash., for defendants-appellees.
 Appeal from the United States District Court for the Western District of Washington.
 Before WRIGHT, TANG and REINHARDT, Circuit Judges.
 EUGENE A. WRIGHT, Circuit Judge:
 
 
 1
 In this case we are asked to decide whether the advertising or sale of consumer products by a state-regulated natural gas distribution monopoly violates the Sherman Act or Washington antitrust law, based on a theory of "monopoly leveraging." The district court found no antitrust violations, and we affirm.
 
 FACTS AND PROCEEDINGS BELOW
 
 2
 Lawrence Catlin, James C. Fry and James A. Fry, appellants, were in the business of selling vent dampers, energy saving devices installed on flue pipes of oil or gas-fired furnaces and water heaters. Washington Natural Gas (WNG), appellee, is a state-regulated utility with an exclusive right to sell natural gas in prescribed geographic areas. Its merchandising division sells numerous gas-related consumer products, including vent dampers. It is undisputed that appellants and WNG competed in the sale of vent dampers within WNG's exclusive territory (King, Pierce, and Snohomish Counties).
 
 
 3
 Appellants filed this action in federal district court, alleging that WNG abused its natural gas monopoly power in violation of federal and state antitrust laws (15 U.S.C. Sec. 2 and Wash.Rev.Code Sec. 19.86.040) and Washington's Public Utility Statute (Wash.Rev.Code Secs. 80.04.440 and 80.28.090). Following a four day bench trial, the court entered judgment in favor of WNG. It found that WNG "did not abuse its lawfully obtained monopoly power in the natural gas market" and that appellants "have suffered no actionable damage as a result of any conduct by [WNG] that is at issue in this case." It concluded that WNG had not violated Section 2 of the Sherman Act, the state antitrust (monopoly) statute, or the state public utility statute.
 
 Appellants raise these issues on appeal:
 
 4
 1. Did the district court err in concluding that WNG did not abuse its natural gas monopoly power in violation of state and federal antitrust laws?
 
 
 5
 2. Did it err in concluding that WNG did not violate Washington's Public Utilities Statute?
 
 
 6
 3. Did it err in concluding that appellants failed to prove "actionable damage" as a result of WNG's challenged conduct?
 
 ANALYSIS
 I. STANDARD OF REVIEW
 
 7
 We review de novo the district court's legal conclusions and we review its factual findings for clear error. United States v. McConney, 728 F.2d 1195, 1200-01 (9th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984).
 
 
 8
 We review de novo the interpretation and application of state law. Kisor v. Johns-Manville Corp., 783 F.2d 1337, 1340 (9th Cir.1986).
 
 II. Monopoly Leveraging
 
 9
 Appellants contend that WNG abused its lawful monopoly power in natural gas distribution by using it as leverage to gain an unfair advantage in the vent damper market. They challenge two specific business practices of WNG's merchandising division.
 
 
 10
 WNG printed "hot potato" advertisements for its vent dampers on billing envelopes sent to WNG's 217,000 residential gas customers in the three counties. Its vent damper was the "featured item" in ten mailings and was the "minor item" in 43 mailings.
 
 
 11
 Appellants contend that this "piggy-back" technique resulted in $2 million in "free postage" benefits for WNG in the vent damper market. WNG concedes that postage costs for billings were included in rates paid by its natural gas customers, but contends that the challenged advertising added nothing to the cost of postage. WNG contends also that printing costs were allocated to WNG's merchandising division and were not charged to natural gas customers.
 
 
 12
 Similarly, appellants challenge WNG's practice of allowing its merchandising division exclusive use of WNG's natural gas customer list.[1] Appellants contend that, without the benefit of this list, their cost of blanket advertising to obtain comparable public recognition was prohibitive. Appellants claim that they should be "given funds sufficient to mail their own vent damper materials to all gas customers 53 times" ($2 million), that WNG's merchandising division should be required to pay its own postage, or that appellants should be given "equal time to advertise their products in WNG's 'hot potatoes' ". WNG asserts that its customer list is privileged "trade secret" information unaffected by antitrust laws.
 
 
 13
 Appellants' antitrust claim rests on a theory of "monopoly leveraging" stated by the Second Circuit in Berkey Photo, Inc. v. Eastman Kodak Co., 603 F.2d 263 (2d Cir.1979), cert. denied, 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980). "[T]he use of monopoly power attained in one market to gain a competitive advantage in another is a violation of Sec. 2, even if there has not been an attempt to monopolize the second market. It is the use of economic power that creates the liability." Id. at 276.
 
 
 14
 In defense of its business practices, WNG quotes from the same paragraph in Berkey Photo. It contends that any prohibition as to the "use of monopoly power" does not extend to the lawful use of advantages brought about by size and integration:
 
 
 15
 [A] large firm does not violate Sec. 2 simply by reaping the competitive rewards attributable to its efficient size, nor does an integrated business offend the Sherman Act whenever one of its departments benefits from association with a division possessing a monopoly in its own market. So long as we allow a firm to compete in several fields, we must expect it to seek the competitive advantages of its broad-based activity--more efficient production, greater ability to develop complementary products, reduced transaction costs, and so forth. These are gains that accrue to any integrated firm, regardless of its market share, and they cannot by themselves be considered uses of monopoly power.
 
 
 16
 Id. at 276 (emphasis added).
 
 
 17
 We must decide whether this court has adopted the "monopoly leveraging" theory of antitrust liability and whether this theory is an alternative to proving monopolization or an attempt to monopolize.
 
 A. Monopoly Leveraging in the Ninth Circuit
 
 18
 Appellants contend that this court "recognized" and adopted the monopoly leveraging theory in M.A.P. Oil Co., Inc. v. Texaco, Inc., 691 F.2d 1303 (9th Cir.1982). However, in M.A.P. Oil, we did not elaborate upon the nature or application of the monopoly leveraging theory. We held only that plaintiffs had failed to identify a relevant product or service market, a "threshold requirement" essential to proving any monopolization claim. Id. at 1306. We observed only that under a monopoly leveraging theory, "the market identification burden is compounded ... because proof of the existence of two separate product or service markets is necessary." Id.
 
 
 19
 M.A.P. Oil did not address the applicability of the monopoly leveraging theory to a firm operating in two markets with no purpose to obtain or preserve monopoly power in either market. In fact, the dispositive issue in M.A.P. Oil was that a separate "distribution services" market did not exist apart from the gasoline "sale" market.
 
 
 20
 The existence and scope of monopoly leveraging as an independent basis for Section 2 liability in this court is not clear. We do not view the few cases discussing the issue as an adoption of the version of the theory urged by appellants. Our reference to monopoly leveraging in M.A.P. Oil purported to bar only the use of monopoly power in one market "to gain an unwarranted competitive advantage" in the leveraged (second) market. Id. at 1306 (emphasis added).
 
 
 21
 In Foremost Pro Color, Inc. v. Eastman Kodak Co., 703 F.2d 534 (9th Cir.1983), cert. denied, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984), we held that to constitute a valid claim under Section 2, the introduction of the product in a second market must involve "some associated conduct which constitutes an anticompetitive abuse or leverage of monopoly power ... rather than aggressive competition on the merits." Id. at 545-46. (emphasis added) See also Betaseed, Inc. v. U and I, Inc., 681 F.2d 1203, 1231 n. 42 (9th Cir.1982) ("A firm may not use its market position as a lever to create a monopoly in another market." (emphasis added)).
 
 
 22
 We have not adopted a monopoly leveraging theory flatly prohibiting the use of lawfully acquired monopoly power in one market to gain any competitive advantage in another market, especially where there has been no attempt to monopolize in the second market and no abuse of monopoly power in the first. We question whether Berkey Photo itself prohibits such leveraging. It defined "uses of monopoly power" to exclude reaping benefits of "efficient size," integration and "competitive advantages of [a monopoly's] broad-based activity." 603 F.2d at 276. Moreover, we have not held that monopoly leveraging is a separate Section 2 violation with elements of proof distinct from monopolization or attempted monopolization.
 
 
 23
 Other circuits have not adopted the "monopoly leveraging" theory announced by the Second Circuit in Berkey Photo. See, e.g., Association for Intercollegiate Athletics for Women v. National Collegiate Athletic Association, 735 F.2d 577, 586 n. 14 (D.C.Cir.1984) ("We emphasize that we merely assume for the purposes of argument, and do not affirm, the legal sufficiency of the leveraging offense described in Berkey Photo.")
 
 
 24
 We disagree with appellants' contention that we adopted the monopoly leveraging theory in M.A.P. Oil as a separate basis for Section 2 liability. Moreover, we decline any invitation to adopt the monopoly leveraging theory here as a basis for Section 2 liability independent of any proof of actual or attempted monopolization. In this respect, we follow the decision of the District of Columbia Circuit to "reserve for a case in which decision of the question is necessary the issue of whether leveraging is an independent section 2 offense separate from monoplization and attempted monopolization." Association for Intercollegiate Athletics for Women, 735 F.2d at 586 n. 14.
 
 
 25
 In order to review the district court's conclusion that WNG "did not abuse [its lawfully obtained monopoly] power in violation of Title 15 U.S.C. Sec. 2," we construe appellants' complaint below as alleging monopolization, attempted monopolization, and (assuming arguendo the validity of this theory) monopoly leveraging.
 
 B. Section 2 Liability
 1. Monopolization
 
 26
 To state a valid monopolization claim, appellants must allege (1) possession of monopoly power in a relevant market (2) willful acquisition or maintenance ("use") of that power, and (3) causal antitrust injury. Foremost Pro Color, 703 F.2d at 543. Only the second and third elements are at issue here.
 
 
 27
 a. Use of Monopoly Power
 
 
 28
 Willful acquisition and maintenance of monopoly power must be distinguished from "growth or development as a consequence of a superior product, business acumen, or historic accident." Berkey Photo, 603 F.2d at 274 (quoting United States v. Grinnell, 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966)). It is an elaborate fiction at best to view WNG's vent damper marketing activities as proof of willful maintenance of monopoly power in the gas distribution market. The purpose and effect of an increase in vent damper sales is to conserve energy and decrease natural gas sales.
 
 
 29
 Appellants must do more than prove that WNG has monopoly power and has prevented them from achieving desired levels of vent damper sales.
 
 
 30
 [I]t is consistent neither with Berkey Photo nor with the body of antitrust law as a whole to say that a holder of lawful monopoly power must passively concede everytime [sic] someone else demands the right to do some portion of what that firm does, regardless of whether the services at issue are performed within the scope of the lawfully acquired monopoly and regardless of whether the "monopolist" is merely conducting itself in the way that any other (non-monopolist) firm would under the circumstances.
 
 
 31
 Grason Electric Co. v. Sacramento Municipal Utility District, 571 F.Supp. 1504, 1517 n. 17 (E.D.Cal.1983).
 
 
 32
 We find that WNG's "use of monopoly power" here fits within the "integrated business" exception stated in Berkey Photo. WNG's merchandising division merely "benefits from association with a division possessing a monopoly in its own market," and does not violate the Sherman Act. Berkey Photo, 603 F.2d at 276. "That the dominant firm in any market may ... create demand for new products is perfectly consistent with the competitive forces that the Sherman Act was intended to foster." Foremost Pro Color, 703 F.2d at 546 (emphasis added).
 
 
 33
 b. Causal Antitrust Injury
 
 
 34
 The most significant weakness in appellants' antitrust claim is failure to show causal antitrust injury, "an essential element of any remedy under the Sherman Act." Northwest Publications, Inc. v. Crumb, 752 F.2d 473, 476 (9th Cir.1985). "It is generally sufficient to show with reasonable probability some causal connection between the antitrust violation and a loss of income." Id. (emphasis added). While appellants need not rule out "all possible alternative sources of injury," they must show that the alleged anticompetitive activity was "a material cause of the injury." Dolphin Tours, Inc. v. Pacifico Creative Service, Inc., 773 F.2d 1506, 1509 (9th Cir.1985) (quoting Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 114 & n. 5, 89 S.Ct. 1562, 1570 & n. 5, 23 L.Ed.2d 129 (1969)). The trier of fact must be able to ascertain causal antitrust injury "without engaging in speculation." Id. at 1510.
 
 
 35
 James A. Fry claims that WNG's "interference" with his business forced him into early retirement and cost him $1,000 a month in lost income and $100 to $125 a month in reduced Social Security benefits. However, he presented no specific evidence that WNG's nondisclosure of its customer lists or its advertising caused economic injury to his business. His business already showed a loss before WNG entered the vent damper market.
 
 
 36
 James C. Fry (James A. Fry's son and business partner) indicated that, by entering the vent damper market, they hoped to reverse a decline in their heating and air conditioning service business. The Frys borrowed $30,000 for 200 vent dampers, an exclusive sales territory, and promotional literature. James C. Fry claims he has incurred an extra cost of $198 per month for 30 years in refinancing his home to pay the $20,000 balance on that vent damper order. He testified that he had anticipated acquiring a two percent share of the vent damper market, 3,000 to 3,500 units a year. He conceded, however, that with "no history to go by" he had "just picked a figure out of the air." In his closing argument, appellants' counsel conceded that the market share estimate was "conjecture."
 
 
 37
 Catlin's primary proof of antitrust injury was his testimony that his previous insurance business made a profit after two years whereas his vent damper business showed a loss of $73,000 after the first five years, of which $47,585 accrued after the first two years. No causal connection to WNG's conduct was demonstrated, other than a bald assertion that this loss was somehow caused by WNG's "interference." Id.
 
 
 38
 Appellants failed to demonstrate that WNG's alleged anticompetitive conduct was the cause of any loss of business profits. They claimed as an "increased expense" an amount they would like to spend for ten mailings to WNG's 217,000 customers in order to become as well known as WNG in the vent damper market. Not surprisingly, appellants cite no authority for this novel proposition that a competitor (albeit a monopoly) has a duty to compensate its competitors to ensure that their advertising efforts are equal in magnitude and effectiveness to its own. Nor have appellants cited authority for the proposition that WNG has a duty to disclose its customer list or to bar its merchandising division from using it.
 
 2. Attempted Monopolization
 
 39
 An attempted monopolization claim must show (1) a specific intent to monopolize a relevant market, (2) predatory or anticompetitive conduct, and (3) a dangerous probability of success. Airweld, Inc. v. Airco, Inc., 742 F.2d 1184, 1192 (9th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985).
 
 
 40
 Appellants' Section 2 claim here, construed as an assertion that WNG has attempted to monopolize the vent damper market, fails on each element. No evidence of WNG's specific intent to monopolize the vent damper market was introduced. Proof of WNG's "unfair or predatory conduct," from which such intent may be inferred, is also lacking here. See Drinkwine v. Federated Publications, Inc., 780 F.2d 735, 740 (9th Cir.1985), cert. denied, --- U.S. ----, 106 S.Ct. 1471, 89 L.Ed.2d 727 (1986). The only anticompetitive conduct challenged on appeal is WNG's use of its mailing list to advertise in gas billings, an advantage available to it as an integrated business, outside the reach of Section 2. See Berkey Photo, 603 F.2d at 276.
 
 
 41
 Appellants concede that eight to twelve manufacturers supply at least 50 different brands of vent dampers. Yet no attempt was made to describe accurately the nature of the vent damper market in this relevant three-county area. Instead, appellants merely compared their vent damper sales (157) to WNG's (1,565) and concluded that "WNG captured a minimum of 90.8% of all vent damper sales." This analysis ignores all other vent damper competitors in the relevant geographic area. It is insufficient for determining either WNG's current monopoly strength in the vent damper market or its "dangerous probability of success" in achieving such monopoly power.
 
 3. Monopoly Leveraging
 
 42
 Assuming arguendo that monopoly leveraging is a distinct Section 2 violation, we must decide whether appellants have proved the elements of such an offense. In Grason Electric, Judge Karlton outlined five elements of a monopoly leveraging claim: (1) monopoly power in a relevant market; (2) challenged activities in a defined second market, distinct from the first (monopoly) market; (3) "use of ... monopoly power rather than mere employment of other advantages that [the monopolist] enjoys by virtue of size, integration, etc.,"; (4) "unwarranted competitive advantage" in the leveraged market; and (5) causal antitrust injury. Grason Electric, 571 F.Supp. at 1518-19.
 
 
 43
 In effect, this is a restatement of the elements required for a monopolization or attempted monopolization claim. Appellants claim that each of these elements was proved at trial. In fact, only the first two were sufficiently demonstrated. Appellants failed to prove that WNG's marketing activity was an abuse of monopoly power rather than an advantage of size and integration. Nor did they prove that WNG's vent damper marketing activity was "directed at smothering competition" in either relevant market. Berkey Photo, 603 F.2d at 275. WNG's conduct did not amount to an "unreasonable restraint on competition." Grason Electric, 571 F.Supp. at 1519. Finally, appellants have failed to prove with reasonable probability that they suffered any antitrust injury caused by WNG's challenged conduct.
 
 
 44
 We conclude that appellants' antitrust action fails, whether construed as a complaint alleging monpolization, attempted monopolization or monopoly leveraging. Appellants failed to "prove the disputed use of monopoly power in fact caused economic injury and that such use was unlawful." Association for Intercollegiate Athletics for Women, 735 F.2d at 586.
 
 III. Public Utilities Statute
 
 45
 Appellants contend that WNG's vent damper marketing activities violated Wash.Rev.Code Sec. 80.28.090.[2] They argue that this statute prohibits WNG from granting preferences to itself. However, the statute does not prohibit every preference to any corporation, only "any undue or unnreasonable preference or advantage." Wash.Rev.Code Sec. 80.28.090 (emphasis added).
 
 
 46
 Appellants argue that Wash.Rev.Code Sec. 80.280.090 parallels the prohibition in 15 U.S.C. Sec. 2 against monopoly leveraging. To the extent their monopoly leveraging claim fails under the Sherman Act, so does their claim under the Washington Public Utilities Statute. Even if we were to assume that this statute could be violated by conduct that does not rise to the level of a Section 2 violation, the statutory scheme and Washington case law do not support appellants' view that one of WNG's integrated divisions is barred from obtaining any business advantage over a competitor.
 
 
 47
 Wash.Rev.Code Sec. 80.28.090 applies to ensure that utility "rates [are] just and reasonable and nondiscriminatory." Earle M. Jorgensen Co. v. City of Seattle, 99 Wash.2d 861, 870, 665 P.2d 1328, 1333, cert. denied, 464 U.S. 982, 104 S.Ct. 425, 78 L.Ed.2d 359 (1983). It "condemns 'undue or unreasonable preference' between similarly situated customers." Cole v. Washington Utilities & Transportation Commission, 79 Wash.2d 302, 311, 485 P.2d 71, 76 (1971) (emphasis added). The language of the statute and interpretive case law do not support its application to the facts here. Appellants' attack on WNG's vent damper activities, a benefit of business integration, as a violation of the "unreasonable preference" prohibition of Wash.Rev.Code Sec. 80.28.090, must fail.
 
 
 48
 The district court did not err in interpreting and applying Wash.Rev.Code Sec. 80.28.090.
 
 IV. Causal Antitrust Injury
 
 49
 As detailed in Part II, appellants failed to prove causal antitrust injury. Their speculative damage allegations do not support a claim under either Section 2 of the Sherman Act or its equivalent under Washington law, Wash.Rev.Code Sec. 19.86.040. Appellants failed to show that WNG's marketing activities caused a loss of profits or other economic damages alleged. In fact, the record indicates that appellants' competitive disadvantage in the vent damper market was due largely to their higher wholesale costs for vent dampers.
 
 
 50
 The district court's finding, that appellants "ha[d] suffered no actionable damage as a result of any conduct by [WNG] that is at issue in this case," is not clearly erroneous.
 
 
 51
 Appellants contend alternatively that, even if their damages were not substantial or could not be determined reliably, they are entitled to nominal damages. Appellants' reliance on Knutson v. Daily Review, Inc., 468 F.Supp. 226 (N.D.Cal.1979), aff'd, 664 F.2d 1120 (9th Cir.1981), is misplaced. That court recognized the requirement that plaintiff prove "both the fact of damage and the amount of damage." Id. at 229 (emphasis in original). "These are two separate proofs." Id. In Knutson, the fact of damage had been established on a prior appeal and was beyond challenge. Id. at 230, 232.
 
 
 52
 Here, appellants have not "established[ed] with reasonable probability the existence of a causal connection between defendants' violation of the antitrust law and plaintiffs' revenue-impairing injury." Id. at 229. No fact of damage has been shown.
 
 
 53
 The district court found that appellants "have suffered no actionable damage as a result of any conduct by [WNG] that is at issue in this case." (emphasis added) That finding is not clearly erroneous and precludes an award of nominal damages.
 
 
 54
 Finally, appellants contend that they are "entitled to injunctive relief under 15 U.S.C. Sec. 26 irrespective of whether their monetary claims are substantial." This claim fails for the same reason discussed above, failure to prove actionable damage.
 
 
 55
 Section 16 of the Clayton Act, 15 U.S.C. Sec. 26, is explicit that injunctive relief requires a showing of "loss or damage by a violation of the antitrust laws." See Out Front Productions, Inc. v. Magid, 748 F.2d 166, 168-69 (3d Cir.1984) (private antitrust plaintiff must demonstrate a violation of the antitrust laws to obtain injunctive relief); Parks v. Watson, 716 F.2d 646, 662 (9th Cir.1983) (plaintiff must demonstrate the "requisite injury ... proximately resulting from the ... violation of the antitrust laws").
 
 
 56
 The district court did not err in concluding that WNG did not violate Section 2 of the Sherman Act. Appellants' failure to demonstrate a violation of the antitrust laws bars their claim for injunctive relief.
 
 CONCLUSION
 
 57
 Whether construed as a claim of monopolization, attempted monopolization or monopoly leveraging under Section 2 of the Sherman Act, no antitrust violation resulted from WNG's sale of vent dampers in competition with appellants. No actionable antitrust damages were proved. Appellants are not entitled to treble damages, nominal damages or injunctive relief. Nor did WNG grant an "unreasonable preference or advantage" to itself in violation of Washington Public Utilities statutes.
 
 
 58
 The judgment of the district court is AFFIRMED.
 
 
 59
 REINHARDT, Circuit Judge, concurring in the judgment:
 
 
 60
 I concur in the judgment. After a bench trial, the district court found that defendants' acts had not caused injury to the plaintiffs. That finding is not in error. Accordingly, plaintiffs are not entitled to damages on any of their causes of action. Injury is also required for an injunction to be granted under the Clayton Act. See Clayton Act Sec. 16 (15 U.S.C. Sec. 26 (1982)). Thus, plaintiffs are not entitled to an injunction under the Clayton Act, either.
 
 
 61
 Because the judgment of the district court can be affirmed on the ground that plaintiffs suffered no injury, I see no reason to consider or decide, as the majority does, various difficult and unsettled questions of antitrust law. These questions should be reserved for a case in which their resolution is required by the facts of the case. Accordingly, I concur in the judgment.
 
 
 
 [1]
 In their opening brief, appellants suggested that they were seeking disclosure of WNG's customer list. In their reply brief, they denied that they ask for disclosure. Instead, they assert that WNG should be barred from permitting its merchandising division to use the list to advertise vent dampers "to the detriment of competition in the vent damper market."
 
 
 [2]
 This section of Washington's Public Utility Statute provides: "No gas company ... shall make or grant any undue or unreasonable preference or advantage to any person, corporation, or locality ... or subject any particular person, corporation or locality ... to any undue or unreasonable prejudice or disadvantage in any respect whatsoever."