OAHU GAS SERVICE, INC.,
Plaintiff-Appellee,

v.

PACIFIC RESOURCES INC., Gasco,
Inc., Defendants-Appellants.

No. 86–2250.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Aug. 10, 1987.

Decided Oct. 9, 1987.

As Amended Nov. 27, 1987.

William S. Boyd, San Francisco, Cal., for defendants-appellants.

Maxwell Blecher, Los Angeles, Cal., for plaintiff-appellee.

Before WRIGHT, FARRIS and THOMP-SON, Circuit Judges.

FARRIS, Circuit Judge:

Oahu Gas Services, Inc., sued Pacific Resources, Inc., under Section 2 of the Sherman Act for monopolization and attempted monopolization of propane sales in Hawaii. Oahu Gas alleged that Pacific Resources' unlawful conduct included: (1) a decision in 1974 not to begin producing propane and (2) a campaign in 1982 to force Oahu to lower prices by offering sham cut-rate contracts to Oahu's customers. After trial, a jury found in favor of Oahu and awarded treble damages of $4,963,998.00. Pacific Resources appeals the denial of its motion for judgment notwithstanding the verdict.

## BACKGROUND

Until 1972, Gasco, a subsidiary of Pacific Resources, was the sole retail seller of propane gas in Hawaii. It received virtually all its propane from Chevron, which operated the only propane refinery in Hawaii. In 1972, Oahu Gas Service was formed and began selling propane on Oahu. Its propane supplies also came from Chevron.

Beginning in 1973, the federal government controlled the price and allocation of propane. The base period for determining allocations was May 1972, before Oahu Gas had begun business. Oahu therefore had to apply to the Department of Energy for a "base period volume" of propane that Chevron would be required to supply.

During the energy crisis, price controls on domestically produced propane led Chevron to produce the minimum required by the Department of Energy. Gasco bought increasing amounts of propane from foreign suppliers. During these years, Oahu Gas repeatedly applied to the Department of Energy for larger allocations of propane. Gasco opposed these applications because giving Oahu more low-cost domestic propane would require Gasco to buy more expensive foreign propane, thus increasing Oahu's cost advantage. The Department of Energy denied Oahu's requests until, in July 1979, the Department increased Oahu's share of domestic propane on the condition that Oahu pay Gasco $163,108.00 to offset some of Gasco's additional costs for importing more foreign propane.

One basis for Oahu's Sherman Act allegations was the decision of Hawaiian Independent Refinery, Inc.—a subsidiary of Pacific Resources—not to produce propane in the 1970s. Hawaiian Independent Refinery began operating a petroleum refinery in 1972, producing chiefly military fuels. In early 1973, before price controls went into effect, Hawaiian planned to modify its refinery to permit production of propane and gasoline. The plans assumed that the modifications could be completed by 1976 and that Gasco would be the chief customer for propane. Under price controls, however, Hawaiian's propane would have had the same ceiling price as Chevron's. Thus the refinery expanded only to permit gasoline production, which began in May 1975. After price controls ended in 1981, the refinery was modified to produce propane. It has sold propane to Gasco and to Aloha Gas, a small new propane distributor. It has expressed a willingness to sell propane to Oahu Gas.

Another basis for Oahu's allegations was Gasco's marketing program in 1982. During the energy crisis, demand for propane fell as consumers turned to alternative energy sources. With the end of regulation in 1981 and the beginning of propane production at Hawaiian's refinery in 1982, propane supplies became more plentiful. Gasco began a marketing program in 1982 that included offers of low-cost long-term contracts to large-volume purchasers, both its own customers and customers served by Oahu Gas. The prices offered were above Gasco's average total cost of supplying propane, but Oahu asserted at trial that the offers were "shams," designed to force Oahu to cut prices to its own customers. Oahu did cut prices to those customers, resulting in such low profits, Oahu claims, that it was nearly put out of business. None of Oahu's customers accepted Gasco's offers. Several of Gasco's own customers accepted the offers. In June 1982, Oahu sought and obtained an injunction prohibiting Gasco from soliciting Oahu's customers while they were under contract to Oahu.

The record indicates several uncontroverted facts relating to the relevant market and market shares of Gasco and Oahu Gas. Before Oahu began business in 1972, Gasco served 100% of the propane market on Oahu and in the "outer islands." After Oahu Gas began operating, Gasco's share of the market on Oahu declined steadily. By 1983, before the trial, Oahu sold about 30% of the propane in Oahu. Oahu Gas dominated sales to high-volume commercial and industrial users on Oahu, supplying 78% of that sub-market in 1985. Gasco supplied about 20% of those customers; Aloha Gas supplied the remaining 2%. Oahu Gas did not sell propane in the outer islands.

Oahu's claims of monopolization and attempted monopolization went to trial in 1985. The jury returned a verdict in favor of Oahu and found treble damages of $4,963,998.00. The court also awarded attorneys fees of $873,324.00.

## DISCUSSION

1. *Monopoly Power in the Relevant Market*

The offense of monopolization under Section 2 of the Sherman Act has two elements: "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966); *see also Catlin v. Washington Energy Co.,* 791 F.2d 1343, 1347 (9th Cir.1986) (making explicit as a third factor the implicit requirement of

"causal antitrust injury"). The jury found that Gasco had monopoly power in the relevant market from 1972 to 1982, when its alleged exclusionary conduct took place. Because Pacific Resources is appealing from the denial of a motion for judgment notwithstanding the verdict, we review the evidence on this factual issue in the light most favorable to Oahu and draw all reasonable inferences in Oahu's favor. *Peterson v. Kennedy*, 771 F.2d 1244, 1252 (9th Cir.1985), *cert. denied*, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986); *see also Forro Precision, Inc. v. I.B.M. Corp.*, 673 F.2d 1045, 1058 (9th Cir.1982) (describing the standard of review for a motion to direct verdict, which is the same as the standard for JNOV). "A JNOV is improper if reasonable minds could differ over the verdict." *Peterson*, 771 F.2d at 1252.

There is no question that Gasco, a subsidiary of Pacific Resources, distributed 100% of Hawaii's propane in 1972, before Oahu Gas entered the market. Gasco is still the only supplier of propane on the outer islands. Pacific Resources contends, however, that the decline of Gasco's market share after Oahu entered the market and Aloha's entry into the market show that Gasco did not have monopoly power. Pacific Resources also contends that the relevant market consists of large-scale consumers of propane on Oahu, rather than the whole propane market. If so, Oahu Gas actually had a much larger share of that "submarket" by 1985 than did Gasco.

■ Determining the relevant market typically requires an inquiry into the nature of the product, *see, e.g., United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956), and the geographical area of effective competition. *United States v. Grinnell*, 384 U.S. at 575–76, 86 S.Ct. at 1706. Determining the existence of monopoly power in the particular market usually depends on market share and barriers to entry, but the inquiry focuses more generally on the power to "control prices or exclude competition." *U.S. v. duPont*, 351 U.S. at 391, 76 S.Ct. at 1005. The factors to consider may vary from case to case, so no one factor is determinative: "Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of

actual detrimental effects, such as reduction of output' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effect.'" *FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 106 S.Ct. 2009, 2019, 90 L.Ed.2d 445 (1986).

■ The jury's finding that Gasco had monopoly power in the whole Hawaiian propane market is consistent with the Court's view that monopoly power involves "the potential for genuine adverse effects on competition." That Gasco completely dominates Hawaii's outer islands is evidence supporting the jury's finding of monopoly power. Evidence about the difficulty of entry to the propane market also supports the jury's finding. The jury could reasonably have concluded that Oahu's success in capturing a significant market share on Oahu may have been due to the "insider" status of its founder, once an executive with Gasco, who took some large accounts with him when he left Gasco. The only other new entrant to the market, Aloha Gas, has remained very small. Viewing all this evidence in the light most favorable to Oahu, we hold that the jury could reasonably conclude that Gasco had monopoly power in the relevant market.[1]

2. *The Decision Not to Expand the Refinery*

The second element of monopolization under Section 2 of the Sherman Act is "the willful acquisition or maintenance of [monopoly] power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident." *U.S. v. Grinnell*, 384 U.S. at 570–71, 86 S.Ct. at 1703–04; *see also Catlin v. Washington Energy*, 791 F.2d at 1347. The jury was asked to determine whether legitimate business reasons or anticompetitive, exclusionary motives lay behind Pacific Resources' 1972 decision not to modify its Hawaiian Refinery to permit propane production. Whether specific conduct is anticompetitive under the Sherman Act is a question of law that we review *de novo. Western Concrete Structures Co. v. Mitsui & Company (U.S.A.), Inc.*, 760 F.2d 1013, 1016 (9th Cir.), *cert. denied*, 474 U.S. 903, 106 S.Ct. 230, 88 L.Ed.2d 229 (1985).

The factual questions about Pacific Resources' allegedly exclusionary conduct in

---

**1.** Because we uphold the jury's finding of monopoly power, we need not consider the attempted monopolization claim that was an alternative ground for the jury's verdict.

the early 70s were resolved at trial. It was clear that expanding the refinery to permit propane production would have been uneconomical under federal price controls in place at the time. It was also clear, however, that the decision not to produce propane had been based not only on economic factors but also on a desire to restrict the supply of propane potentially available to Oahu Gas. There is evidence in the record that the management of Pacific Resources feared that increasing the supply of propane in Hawaii would result in Oahu's getting more propane to sell, increasing its market share.

■ The desire to maintain or increase one's market share is not in itself an antitrust violation, of course. Nor is a decision to forego the production of propane an illegal act *per se*. But a monopolist must take care that otherwise lawful acts do not have anticompetitive effects because of its monopoly power.

■ We therefore reject Pacific Resources' broad contention that the antitrust laws may never impose duties on a monopolist to aid its competitors. Because of a monopolist's special position the antitrust laws impose what may be characterized as affirmative duties.[2] These duties are not absolute, however; they arise only when there is no justification for refusing to aid a competitor.

■ Where a monopolist's refusal to aid a competitor is based partially on a desire to restrict competition, we determine antitrust liability by asking whether there was a legitimate business justification for the monopolist's conduct. *See Aspen Skiing Co. v. Aspen Highland Skiing Corp.*, 472 U.S. 585 (1985); *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1478 (9th Cir.1986); *Drinkwine v. Federated Publications, Inc.*, 780 F.2d 735, 740 (9th Cir.), *cert. denied*, 106 S.Ct. 1471 (1986).

■ The investment required of Pacific Resources to produce propane would have resulted in a negative return. In light of the then-existing price controls, it was not economically efficient for Pacific Resources to invest its resources in propane production. The decision to forego propane production did not exclude competition unnecessarily. The economic rationale, even if not the only rationale for the decision, excluded competition necessarily. Economic necessity distinguished this conduct from "willful acquisition or maintenance of [monopoly] power," *United States v. Grinnell*, 384 U.S. at 570–71, because it involved the 'business acumen' that *Grinnell* specifically exempts from antitrust liability. *Id.*

The jury was instructed improperly. It was given an either/or choice: it could decide whether Pacific Resources' decision was based on economic motives *or* on a desire to maintain its market share.[3] It should have been instructed that the desire to maintain market power—even a monopolist's market power—cannot create antitrust liability if there was a legitimate business justification for refusing to produce propane.

Two lines of cases support our holding, though they are not directly controlling. A line of "product innovation" cases has consistently rejected antitrust liability for a monopolist's decision about when or whether to market new products. *See, e.g., Foremost Pro Color, Inc. v. Eastman Kodak Co.*, 703 F.2d 534, 545 (9th Cir.1983), *cert. denied*, 465 U.S. 1038, 104 S.Ct. 1315, 79 L.Ed.2d 712 (1984); *California Computer Products v. I.B.M. Corp.*, 613 F.2d 727 (9th Cir.1979); *see also GAF Corporation v. Eastman Kodak Co.*, 519 F.Supp. 1203, 1232 (S.D.N.Y.1981) ("[N]o court has yet found a monopolist's failure to market a product as satisfying § 2's conduct requirement.").

These cases, involving technological innovations, have held that the contested marketing decisions derived from "a superior product," and are therefore exempt from antitrust liability. Oahu Gas contends that

---

**2.** For example, a ski resort with monopoly power was required to continue a marketing arrangement with its small neighbor there was no legitimate business justification for discontinuing it, and the arrangement increased competition and benefited consumers. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985).

**3.** The jury instruction on this issue was:

To sum up, you must determine whether PRI and Gasco maintained monopoly power in a relevant market by policies and conduct which were not legitimate business decisions but were instead designed primarily to further any domination of a relevant market....

You should seek to determine if the challenged conduct is supported by legitimate business reasons *or* whether it was a deliberate effort to injure a smaller rival which caused defendants to sacrifice short-run benefits and consumer good will.

such cases are inapposite, because the product at issue here is propane, hardly an innovation. But "business acumen"—the economics of timing a technological innovation—is also an aspect of these cases.

In *California Computer* we addressed specifically the issue of when a question of legitimate business purpose may go to a jury. Where IBM redesigned products in such a way that they were incompatible with a competitor's products, and where such design changes were justified "by reason of lower manufacturing cost and price or improved performance[,] ... [t]he reasonableness of IBM's conduct ... did not present a jury issue." *California Computer Products*, 613 F.2d at 744.

Another line of cases that Oahu asks us to consider are "supply restriction" cases. It contends that Pacific Resources impermissibly sought to restrict the supply of propane in the Hawaiian Islands. *See, e.g., NCAA v. Board of Regents*, 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984); *Litton Systems, Inc. v. AT & T*, 700 F.2d 785 (2d Cir.1983), *cert. denied*, 464 U.S. 1073, 104 S.Ct. 984, 79 L.Ed.2d 220 (1984); *Pacific Coast Agricultural Export Ass'n v. Sunkist Growers, Inc.*, 526 F.2d 1196 (9th Cir.1975), *cert. denied*, 425 U.S. 959, 96 S.Ct. 1741, 48 L.Ed.2d 204 (1976). A theory of liability based on "supply restriction" must fail because Pacific Resources had no monopoly power over *supplies* of propane to Hawaii. Chevron produced all Hawaiian propane until 1982.[4] Contrary to Oahu's argument, the regulatory scheme in place in the 70s did not give Pacific Resources control over propane supplies. Oahu appealed to the Department of Energy for larger allocations of propane, and it was ultimately successful. Oahu's supply restriction theory cannot support antitrust liability for Pacific Resources' decision not to produce propane.

As a matter of law, we reverse the judgment of antitrust liability based on the refinery episode. Pacific Resources' decision to refrain from producing propane because it was not economically efficient is sufficient justification to preclude antitrust liability.

### 3. *Gasco's 1982 Marketing Campaign*

The jury found that Gasco's 1982 campaign to offer cut-rate contracts to large propane purchasers was anticompetitive and predatory. Pacific Resources contends that Gasco "had the absolute right to offer reduced prices so long as those offers were not shown to be below costs or shown to be predatory by clear and convincing evidence." Oahu, on the other hand, maintains that Pacific's "efforts to fit their 'blitzkrieg' conduct into a predatory pricing mold must be rejected," because Gasco "made false 'offers' without ever intending to compete for that business."

In reviewing this denial of a motion for a judgment notwithstanding the verdict, we must take the factual evidence in the light most favorable to Oahu and draw all reasonable inferences in Oahu's favor. *See Peterson v. Kennedy*, 771 F.2d at 1252. "A JNOV is improper if reasonable minds could differ over the verdict." *Id.*

Applying these guidelines to the jury's findings, we conclude that the court was justified in denying the JNOV motion. Pacific's argument that the evidence could not reasonably support a claim for predatory pricing, though accurate, is misplaced. This is not a predatory pricing case. The evidence relevant to the finding of predatory conduct in this case is not the prices Gasco offered. It is the contracts themselves and the testimony about how those contracts were offered to customers of Gasco and Oahu. In the case of predatory pricing, a monopolist is willing to risk losses in the short-run to eliminate a competitor. In this case, however, the jury may be presumed to have accepted Oahu's claim that Gasco was not taking such a risk because the cut-rate contracts it offered were "shams."

Under Section 2 of the Sherman Act, any conduct that "is not true competition" and "makes sense only because it eliminates competition" is forbidden. If conduct by a monopolist "does not enhance the quality of attractiveness of the product, reduce its cost, or alter the demand function that all competitors confront," and is driven by a purpose "to create a monopoly

---

4. For this reason the "essential facilities" theory would not apply either. *See MCI Communications Corp. v. AT & T Co.*, 708 F.2d 1081, 1132 (7th Cir.), *cert. denied*, 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983) (plaintiff must show control of the essential facility by a monopolist).

by means other than fair competition," it violates section two. *William Inglis, Etc. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1030–31 (9th Cir.1981); *see* 3 P. Areeda & D. Turner, Antitrust Law ¶ 738a (1978). Fraudulent offers of cut-rate prices whose only rationale is a desire to drive rivals out of the market is exclusionary conduct within this definition.

█ Our review of the record convinces us that the evidence reasonably supported the jury's finding of a predatory rationale in the 1982 marketing campaign. Most of the Oahu Gas customers solicited by Gasco were known to have had long-term contracts with Oahu that they would be unlikely to break. A Gasco employee testified that when making the offer to an Oahu customer, she invited the customer to ask Oahu to meet or beat the offered price cut. The jury may also be presumed to have found credible Oahu's evidence that Gasco did not make the same offers to its own customers as it did to Oahu's customers.

On this record, the trial court's denial of the JNOV was not improper. We affirm that portion of the judgment based on the jury's finding that Gasco's marketing campaign in 1982 was anticompetitive and predatory under Section 2 of the Sherman Act.

### 4. *Damages*

█ Because we partially reverse the judgment, the district court, on remand, must strike the damages based on the refinery episode. As for the damages based on the 1982 marketing campaign, we must affirm that portion of the award unless it is clearly unsupported by the evidence. *Chalmers v. City of Los Angeles*, 762 F.2d 753, 760 (9th Cir.1985); *see also, Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 836 (9th Cir.1982) ("[A]n antitrust plaintiff is only obligated to provide the trier-of-fact with some basis from which to estimate reasonably, and without undue speculation, the damages flowing from the antitrust violations.").

Damages flowing from the 1982 marketing campaign were fixed at $421,481.00, before trebling. This was the amount Oahu lost due to the reduced prices it gave from April 30, 1982, through November 30, 1983, to those customers who were solicited for cut-rate contracts by Gasco. Pacific Resources contends that its actions did not cause Oahu's losses. It argues that with the June 1982 injunction against Gasco's campaign, Oahu need not have kept its prices lowered. Any losses from reduced prices after June 30, 1982, were therefore voluntary. Whether Oahu was able to raise its prices again immediately after the injunction is an issue of fact that the jury resolved against Pacific Resources. We do not find this conclusion clearly erroneous and therefore affirm the amount of damages based on the marketing campaign.

Because our partial reversal will reduce the overall damage award, the district court on remand must also recalculate the amount of the award for attorney's fees.

Affirmed in part, reversed in part, and remanded for adjustment of damages and attorney's fees in accordance with this opinion.