885 F.2d 1392
 1989-2 Trade Cases 68,741, 14 Fed.R.Serv.3d 509,
28 Fed. R. Evid. Serv. 1089
 E.W. FRENCH & SONS, INC., a California corporation,
Plaintiff-Appellant,
v.
GENERAL PORTLAND INC., a Delaware corporation, Defendant-Appellee.
E.W. FRENCH & SONS, INC., a California corporation, Plaintiff-Appellee,
v.
GENERAL PORTLAND INC., a Delaware corporation, Defendant-Appellant.
 Nos. 85-6573, 85-6606.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted June 7, 1988.
Decided Aug. 31, 1989.
As Amended Nov. 30, 1989.
 
 Frederick A. Lorig, Los Angeles, Cal., for plaintiff-appellant-appellee.
 Douglas W. Stern, of Pepper, Hamilton & Scheetz, Los Angeles, Cal., for defendant-appellee-appellant.
 Appeal from the United States District Court for the Central District of California.
 Before WALLACE, TANG and FARRIS, Circuit Judges.
 WALLACE, Circuit Judge:
 
 
 1
 E.W. French & Sons, Inc. (French) supplied ready-mix concrete in Southern California. It purchased some of the cement used to make concrete from General Portland Inc. French brought an action against General Portland and others alleging General Portland violated section 1 of the Sherman Act and California's antitrust laws in two different conspiracies, violated California's unfair competition laws, and intentionally interfered with French's prospective business advantage. The district court granted General Portland's motion for a directed verdict on one of the federal antitrust claims. The jury rejected French's other antitrust claim, rejected French's claim of intentional interference, and returned a verdict in favor of French in its unfair competition claim.
 
 
 2
 Both parties appealed. We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm in part, reverse in part, and remand.
 
 
 3
 * French began a ready-mix concrete supplier business in 1954 in Hawthorne, California, and sold concrete throughout Southern California. Ready-mix concrete producers make concrete from cement, sand, and water. French purchased cement at various times from one of six cement producers located in Southern California: General Portland (formerly Pacific Western Industries), Monolith Cement Company, Kaiser Cement & Gypsum Company, Riverside Cement Company, California Portland Cement Company, and Southwest Portland Cement Company. On May 14, 1976, French went out of business.
 
 
 4
 On May 18, 1978, French filed an action in the district court against General Portland, Consolidated Rock Company (Conrock), Transit Mixed Concrete Company, and Livingston-Graham, Inc. The action sought damages under sections 1 and 2 of the Sherman Act, 15 U.S.C. Secs. 1, 2 (1982), sections 3 and 7 of the Clayton Act; 15 U.S.C. Secs. 13a, 18 (1982), sections 16700-16758 of the California Business & Professional Code, Cal.Bus & Prof.Code Secs. 16700-16758 (West 1987) (Cartwright Act), and sections 17000-17101 of the California Business & Professional Code, Cal.Bus. & Prof.Code Secs. 17000-17101 (West 1987) (Unfair Practices Act).
 
 
 5
 French's amended complaint alleged four theories of liability. First, it alleged that General Portland conspired with other cement producers to eliminate independent concrete producers, such as French. The alleged conspiracy involved fixing a high price for cement and providing fewer discounts than those available to large integrated producers of concrete who were owned or controlled by cement companies. The alleged conspiracy spanned from prior to 1958 through 1978. French maintained the conspiracy violated section 1 of the Sherman Act.
 
 
 6
 Second, French alleged that General Portland conspired with Conrock, one of French's competitors, to drive French out of business. This conspiracy involved providing Conrock with cement at a price lower than that charged French, aiding Conrock in its attempts to obtain business, and granting Conrock secret and discriminatory rebates on cement purchases. French maintained the conspiracy violated section 1 of the Sherman Act.
 
 
 7
 Third, as a pendent state claim, French alleged that General Portland and its co-conspirators violated sections 16720, 17045, 17047, and 17048 of the Cartwright Act. French incorporated all of the facts alleged in its two section 1 claims to support this claim. In the same count, French also alleged that General Portland and the co-defendants engaged in unfair competition, thereby violating the California Unfair Practices Act.
 
 
 8
 Finally, as another pendent claim, French alleged that General Portland intentionally interfered with French's prospective business advantage in violation of Cal.Bus. & Prof.Code Secs. 16727, 17045, 17046, 17047, and 17048 by aiding Conrock in its efforts to obtain the Hawthorne Mall project. General Portland allegedly charged Conrock less for cement than it charged French, thereby enabling Conrock to obtain the Hawthorne Mall project.
 
 
 9
 In addition, the complaint alleged that defendants fraudulently concealed the operative facts from French as to all claims. Thus, French argued that each applicable statute of limitations should be tolled.
 
 
 10
 Prior to trial, French settled with Conrock, Transit Mixed Concrete Company, and Livingston-Graham, Inc. Other companies not sued in this litigation agreed, in effect, not to collect disputed debts in exchange for releases. General Portland elected to go to trial.
 
 
 11
 At the close of French's case, General Portland moved for a directed verdict on (1) the price-fixing claim, (2) the conspiracy claim, (3) the unfair competition claim, (4) the intentional interference with prospective business advantage claim, and (5) the alleged fraudulent concealment of all claims. The district court took the motion under consideration and, at the end of General Portland's case, General Portland renewed its motion. The district court granted General Portland's motion for directed verdict on the alleged price-fixing conspiracy under the Sherman and Cartwright Acts and on the fraudulent concealment issue as it related to each claim. The district court denied the motion as to the three other claims, and submitted them to the jury.
 
 
 12
 Pursuant to interrogatories, the jury found that General Portland and Conrock had engaged in a combination or conspiracy which had the purpose or effect of driving French out of business, but the combination or conspiracy did not unreasonably restrain trade in the ready-mix concrete industry. The jury also found that General Portland had interfered with French's prospective business advantage in the Hawthorne Mall project, but French would not have obtained the Hawthorne Mall project absent General Portland's conduct. Finally, with respect to the unfair competition claim, the jury found that General Portland had engaged in unlawful, unfair, or fraudulent business practices which had the purpose or effect of driving French out of business and French suffered resultant damages in the amount of $175,000. The jury declined to award punitive damages.
 
 
 13
 The district court entered judgment. General Portland filed a motion to set aside the verdict on the unfair competition claim and to enter a judgment notwithstanding the verdict. The district court denied the motion. French timely appealed and General Portland timely cross-appealed.
 
 II
 
 14
 The issues presented in this appeal are (A) whether the cement price-fixing conspiracy violated section 1 of the Sherman Act; (B) whether the Conrock conspiracy violated section 1 of the Sherman Act; (C) whether General Portland engaged in unfair competition in violation of California law; and (D) whether General Portland intentionally interfered with prospective business advantage under California law. French has not argued the state Cartwright antitrust claims in its brief to us. Thus, it has abandoned these issues. See Leer v. Murphy, 844 F.2d 628, 634 (9th Cir.1988); Collins v. San Diego, 841 F.2d 337, 339 (9th Cir.1988).
 
 A.
 
 15
 French argues that the district court erred in directing a verdict in favor of General Portland on the section 1 price-fixing claim. Before assessing French's arguments, we review General Portland's assertion that we need not get to French's contentions on this claim.
 
 1.
 
 16
 General Portland argues that the price-fixing claim was time-barred in full because it was not raised until French filed its amended complaint on December 15, 1980. General Portland's theory is that French's price-fixing claim contained in the amended complaint did not arise out of the conduct, transaction, or occurrence set forth in the original complaint filed on May 18, 1978, and therefore did not relate back. See Fed.R.Civ.P. 15(c) ("Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading."). If General Portland is correct, then French's first price-fixing claim is barred by the four-year statute of limitations applicable to claims arising under section 1. See 15 U.S.C. Sec. 15b. The statute of limitations would only allow French to recover on claims that accrued between December 15, 1976, and December 15, 1980, since French amended its complaint on December 15, 1980. If French's recovery is restricted to claims arising during that period, it could not recover at all, given that it ceased operating on May 14, 1976. If, however, the price-fixing claim relates back, then French potentially could recover damages for all claims that accrued between May 18, 1974, and May 18, 1978.
 
 
 17
 The initial complaint alleged that General Portland and others conspired to sell cement at higher prices to small independent ready-mix concrete producers than to large producers. The amended complaint, we believe, fleshes out the conduct involved in the alleged conspiracy in greater detail. The crux of the conspiracy arose out of the "conduct ... set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c). Thus, the claim relates back. Id.
 
 
 18
 This conclusion is supported by Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240, 1259 n. 29 (9th Cir.1982), cert. denied, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983), which rejected an argument similar to that of General Portland. While holding that a particular claim related back, we expressly stated that courts should apply the relation back doctrine of Rule 15(c) liberally and that "[t]his liberality is particularly persuasive in antitrust suits where there is ample opportunity for discovery and other pretrial procedures." Id., quoting Woods Exploration & Producing Co. v. Aluminum Co. of America, 438 F.2d 1286, 1300 (5th Cir.1971), cert. denied, 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972). Our observation in Clipper Exxpress squarely applies to French's amended complaint. Discovery allowed French to provide greater detail regarding the conduct surrounding the conspiracy alleged in its initial complaint. The initial complaint clearly put General Portland on notice of French's price-fixing claim. Thus, the claim is not time-barred in full.
 
 2.
 
 19
 French contests certain evidentiary rulings by the district court. French contends that these errors prevented it from establishing the alleged conspiracy and thus resulted in the directed verdict.
 
 
 20
 We review a directed verdict de novo. West America Corp. v. Vaughan-Bassett Furniture Co., 765 F.2d 932, 934 (9th Cir.1985). We view the evidence as a whole in the light most favorable to the nonmoving party and draw all possible inferences in favor of that party. Blanton v. Mobil Oil Corp., 721 F.2d 1207, 1219 (9th Cir.1983), cert. denied, 471 U.S. 1007, 105 S.Ct. 1874, 85 L.Ed.2d 166 (1985). "A directed verdict is proper when the evidence permits only one reasonable conclusion as to the verdict." Peterson v. Kennedy, 771 F.2d 1244, 1256 (9th Cir.1985), cert. denied, 475 U.S. 1122, 106 S.Ct. 1642, 90 L.Ed.2d 187 (1986). A directed verdict is not proper "if there is substantial evidence to support a verdict for the non-moving party." Id.
 
 
 21
 An action under section 1 of the Sherman Act requires proof of three elements. T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Association, 809 F.2d 626, 632-33 (9th Cir.1987) (T.W. Electrical ). First, a plaintiff must show a contract, combination, or conspiracy to restrain trade. Id.; 15 U.S.C. Sec. 1. "The essence of a section 1 claim is concerted action. The determinative question presented ... is whether appellants have proffered sufficient evidence of a conspiracy...." Wilcox v. First Interstate Bank, 815 F.2d 522, 525 (9th Cir.1987) (citations and quotations omitted). French must present "direct or circumstantial evidence that reasonably tends to prove that [General Portland] 'had a conscious commitment to a common scheme designed to achieve an unlawful objective.' " Id., quoting Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d 775 (1984) (citation omitted). Second, a plaintiff must show the agreement unreasonably restrains trade, under either a per se rule of illegality or a rule of reason analysis. T.W. Electrical, 809 F.2d at 633. Third, a plaintiff must show that the restraint affected commerce. Id. The crux of the dispute is whether French could withstand a motion for a directed verdict on the existence of a conspiracy involving General Portland.
 
 
 22
 French argues that the district court erred in striking certain hearsay evidence. After striking the hearsay evidence, the district court found that there was not "substantial independent evidence of [a] conspiracy" involving General Portland.
 
 
 23
 French maintains that the district court applied the wrong legal standard in concluding that certain statements allegedly made by co-conspirators were not admissible under Fed.R.Evid. 801(d)(2)(E). Rule 801(d)(2)(E) provides: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." In striking the co-conspirator's statements, the district court followed the rule previously mandated under 801(d)(2)(E) in this circuit. The previous rule required a district court to consider evidence independent of the proffered co-conspirator's statements to find the existence of and membership in a conspiracy. See, e.g., United States v. Rosales, 584 F.2d 870, 872 (9th Cir.1978). In Bourjaily v. United States, 483 U.S. 171, 175-82, 107 S.Ct. 2775, 2779-82, 97 L.Ed.2d 144 (1987), however, the Supreme Court expressly rejected this "independent evidence" rule. Thus, a district court may consider the proffered co-conspirator's statements in determining whether the party seeking admission of the proffered evidence has established the existence of a conspiracy and the non-offering party's participation in the conspiracy by a preponderance of the evidence. Id. at 181, 107 S.Ct. at 2782.
 
 
 24
 The statements the district court struck in this case included evidence that, if considered along with other evidence of a conspiracy involving General Portland, may have tipped the balance and allowed the district court to find sufficient evidence of a conspiracy involving General Portland. This finding would have required the court to determine whether the statements were made by co-conspirators in the course and furtherance of the conspiracy. If the district court had admitted the co-conspirator's statements, it may not have granted the directed verdict on the price-fixing conspiracy claim. The district court applied an erroneous legal standard in striking the statements. This erroneous standard may have affected its decision in granting General Portland's motion for a directed verdict on the price-fixing claim. We, therefore, vacate and remand this aspect of the case to the district court to allow it to reevaluate its decision on the alleged co-conspirator statements in light of Bourjaily and United States v. Gordon, 844 F.2d 1397, 1402 (9th Cir.1988) (holding that evidence in addition to proffered hearsay statements is necessary to establish a conspiracy under Rule 801(d)(2)(E)).
 
 
 25
 The parties also contest the district court's decision to admit two mailing lists. French believes the mailing lists show that General Portland exchanged price information with competitors and fraudulently concealed its involvement in the alleged price-fixing conspiracy. General Portland stipulated that the mailing lists were located in its files, but denied it authorized the creation of the lists or actually used the lists. General Portland objected to admitting the documents because they were unauthenticated. The court admitted the documents, however, "for the limited purpose [of] indicating that they were found within [General Portland's] files."
 
 
 26
 We need not decide whether this restriction on the evidence was error if General Portland is correct in its contention, reasserted on appeal, that the exhibits were not properly authenticated. We review a district court's finding of sufficiency of authentication for an abuse of discretion. United States v. Feldman, 788 F.2d 544, 556 (9th Cir.1986), cert. denied, 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).
 
 
 27
 Fed.R.Evid. 901(a) states that "[t]he requirement of authentication ... as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The party seeking to have the evidence admitted need only make a prima facie showing of authenticity. See United States v. Black, 767 F.2d 1334, 1342 (9th Cir.) (Black ), cert. denied, 474 U.S. 1022, 106 S.Ct. 574, 88 L.Ed.2d 557 (1985). In Burgess v. Premier Corp., 727 F.2d 826, 835 (9th Cir.1984) (Burgess ), we upheld the district court's admission of documents authenticated only by the fact of being found in the defendant's warehouse. This fact sufficed for the purpose of the prima facie showing of authenticity. Burgess controls. The district court did not abuse its discretion in admitting the documents. See Black, 767 F.2d at 1342.
 
 
 28
 General Portland unpersuasively relies on Standard Oil Co. v. Moore, 251 F.2d 188, 215 (9th Cir.1957), cert. denied, 356 U.S. 975, 78 S.Ct. 1139, 2 L.Ed.2d 1148 (1958). Moore discusses the business record exception to the hearsay rule; Moore stands for the proposition that the presence of documents in a corporation's files does not necessarily render such documents admissible under the business record exception. See Burgess, 727 F.2d at 835. As in Burgess, General Portland only objects on the basis of Rule 901 and not the business records exception.
 
 
 29
 Once admitted, the trier of fact determines the authenticity of the evidence and its probative force. See Black, 767 F.2d at 1342. The district court ruled, however, that the documents were only admissible for the limited purpose of establishing that the documents existed in General Portland's files. Once the district court found the exhibits prima facie authentic, authenticity and probative value should have been left to the trier of fact. To the extent the district court limited authenticity and probative value in ruling on the motion for directed verdict, the district court abused its discretion. We express no opinion on the authenticity of these documents or their probative force. Rather, on remand the district court should consider the issue in deciding whether a directed verdict was appropriate.
 
 3.
 
 30
 Next, French argues that the district court erred in granting General Portland's motion for directed verdict on the fraudulent concealment issue. If General Portland fraudulently concealed the existence of a price-fixing conspiracy, then the four-year statute of limitations should be tolled. See, e.g., Westinghouse Electric Corp. v. Pacific Gas & Electric Co., 326 F.2d 575, 576 (9th Cir.1964). In its brief on appeal, French only asserted fraudulent concealment with respect to the federal antitrust claims. Thus, our review is limited to the fraudulent concealment issue as it relates to the cement price-fixing claim.
 
 
 31
 French's amended complaint alleges that for twenty years General Portland, its predecessor Pacific Western Industries, and the other co-conspirators fraudulently concealed the conspiracy to fix cement prices. French contends that the district court erred in not allowing the jury to determine whether to toll the four-year statute of limitations, see 15 U.S.C. Sec. 15b, for an indeterminate period, presumably including from May 15, 1958, until May 15, 1978. See Mt. Hood Stages, Inc. v. Greyhound Corp., 555 F.2d 687, 697-98 (9th Cir.1977) (discussing the tolling of the section 15b's four-year statute of limitations due to fraudulent concealment), rev'd on other grounds, 437 U.S. 322, 329 n. 12, 330, 98 S.Ct. 2370, 2375 n. 12, 2375, 57 L.Ed.2d 239 (1978). The district court directed a verdict on this issue in favor of General Portland. In the event the district court finds, on remand, that there is sufficient evidence to go to the jury on the alleged price-fixing claim, this issue will become relevant.
 
 
 32
 Under the equitable doctrine of fraudulent concealment, the applicable statute of limitations is tolled "if the plaintiff proves the defendant fraudulently concealed the existence of the cause of action so that the plaintiff, acting as a reasonable person, did not know of its existence." Hennegan v. Pacifico Creative Service, Inc., 787 F.2d 1299, 1302 (9th Cir.), cert. denied, 479 U.S. 886, 107 S.Ct. 279, 93 L.Ed.2d 254 (1986). To establish fraudulent concealment, French must prove (1) General Portland fraudulently concealed the conspiracy, (2) French did not discover the facts which form the basis of the claim, and (3) French exercised due diligence in attempting to discover the facts. See Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1415-16 (9th Cir.1987).
 
 
 33
 In support of its contention of fraudulent concealment, French relies on the following evidence: (1) Mr. French's (the principal of French) testimony that he attempted to discover the facts which form the basis of the conspiracy claim; he inquired as to price uniformity on the part of cement suppliers, including General Portland, the cement suppliers attributed the uniformity to competition, not price-fixing; Mr. French testified he believed these statements because the individuals making them were his friends and because he was naive; (2) Mr. French's testimony that although he was aware of a 1969 case charging some cement companies with price-fixing, none of the defendants originally named in French's action were involved; and (3) General Portland's fraudulent concealment of the alleged agreement through its mailing of discount and price information to its competitors in "plain white envelopes" in 1970 and 1972. General Portland responds that its denial of price-fixing was not sufficient to toll the statute of limitations. Moreover, there was no evidence presented demonstrating that French lacked knowledge of the operative facts upon which it based its claim. Finally, it asserts that French failed to introduce sufficient evidence demonstrating that it exercised any diligent efforts to discover the operative facts.
 
 
 34
 The first question before us is whether the evidence relied upon by French to support its contention of fraudulent concealment was sufficient to raise a jury issue. Then, we must make the same assessment as to French's failure to discover facts and its diligence.
 
 
 35
 In M.D. Rutledge v. Boston Woven Hose and Rubber Co., 576 F.2d 248, 250 (9th Cir.1978), we stated that "[t]he affirmative act of denying wrongdoing may constitute fraudulent concealment where the circumstances make the plaintiff's reliance upon the denial reasonable." The plaintiff had previously expressed suspicion to government attorneys about defendant's conduct and had even filed suit against a suspected co-conspirator. But the plaintiff failed to use the discovery process to confirm its suspicions about the defendant. We concluded that the plaintiff's extensive earlier litigation experience and his continued efforts to pursue other wrongdoing precluded any inference that it was reasonable to rely on the defendant's denial. Id. at 250 & n. 3.
 
 
 36
 The question in reviewing this directed verdict is whether the alleged denials coupled with the alleged use of "plain white envelopes" to mail pricing information to its competitors permits only one reasonable conclusion: that General Portland did not fraudulently conceal a conspiracy. We believe that a reasonable juror could conclude that this evidence sufficed to show that General Portland sought to fraudulently conceal the alleged conspiracy.
 
 
 37
 Next, we address General Portland's argument that French had actual or constructive knowledge of the facts constituting his claim for relief or would have had knowledge if he exercised reasonable diligence. See id. at 249-50. General Portland argues that for many years before filing suit French knew virtually all of the operative facts which caused it to file its action in 1978. It stresses that in 1969 Mr. French knew that a ready-mix company filed a lawsuit in the District Court for the Central District of California charging some cement companies (including the named defendants) with price-fixing in Los Angeles.
 
 
 38
 The existence of the lawsuit and French's knowledge of it, however, are not tantamount to actual or constructive knowledge of the price-fixing claim. Assessing a similar argument, the Fifth Circuit pointed out in In re Beef Industry Antitrust Litigation, 600 F.2d 1148, 1171 (5th Cir.1979) (footnotes omitted), cert. denied, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980):--
 
 
 39
 The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice, but to rule that it does so as a matter of law is to compel a person situated like these plaintiffs to file suit, on the pain of forfeiting his rights.... The mere filing of a similar lawsuit, without more, does not necessarily give "good ground" because that suit might well be frivolous or baseless.
 
 
 40
 In light of Mr. French's testimony that the defendants originally named in his action were not selling cement in the Los Angeles area in 1969 and thus by his view were not named in that capacity in the 1969 suit, we cannot conclude that the existence of the 1969 lawsuit permits only one reasonable conclusion on the issue of French's actual or constructive knowledge of the facts constituting its claims for relief.
 
 
 41
 We believe there is also sufficient evidence for a reasonable jury to conclude that French exercised the requisite diligence. French sought out the facts to support a potential claim in the face of the assurances and denials of responsibility from the members of the alleged conspiracy. Thus, we conclude that the district court erred in granting a directed verdict on the fraudulent concealment issue as it relates to the price-fixing conspiracy.
 
 B.
 
 42
 French alleged that General Portland and Conrock entered a conspiracy to drive French out of business in violation of section 1 of the Sherman Act. French conceded that the "rule of reason" standard governed this claim. Cf. Kaplan v. Burroughs Corp., 611 F.2d 286, 290 (9th Cir.1979) (Kaplan ) (discussing the difference between a claim premised on a per se violation of section 1 and a claim premised on a rule of reason standard under section 1), cert. denied, 447 U.S. 924, 100 S.Ct. 3016, 65 L.Ed.2d 1116 (1980). The elements of a claim for an unreasonable restraint of trade under the rule of reason analysis of section 1 are:
 
 
 43
 (1) An agreement among two or more persons or distinct business entities;
 
 
 44
 (2) Which is intended to harm or unreasonably restrain competition;
 
 
 45
 (3) And which actually causes injury to competition.
 
 
 46
 Id. at 290. The jury returned special verdicts, finding that General Portland and Conrock engaged in a combination or conspiracy which had the purpose or effect of driving French out of business, but the combination or conspiracy did not unreasonably restrain trade in the ready-mix industry. Therefore, the jury found no violation of section 1. The court entered judgment for General Portland on this conspiracy claim.
 
 
 47
 French argues that the district court erred in instructing the jury on the alleged Conrock conspiracy. Over French's objection, the district court gave the following instruction:
 
 
 48
 If you find that a conspiracy existed between General Portland and Conrock, the purpose of which was to drive the plaintiff out of business, then I instruct you that this conspiracy would not constitute a restraint of trade under the antitrust laws.
 
 
 49
 Our Supreme Court has made it clear that the antitrust laws were enacted to protect competition, not competitors.
 
 
 50
 Hence, it is imperative for the plaintiff to demonstrate that the conspiracy was of a more general nature than simply to eliminate a single competitor, the plaintiff.
 
 
 51
 (Emphasis added.) The instruction suggests that even if the Conrock conspiracy harmed competition, the elimination of a single competitor could never violate section 1. This is not the law. It is true that to restrain trade unreasonably, a conspiracy must harm competition. E.g., NCAA v. Board of Regents, 468 U.S. 85, 104 n. 27, 104 S.Ct. 2948, 2962 n. 27, 82 L.Ed.2d 70 (1984). But the elimination of a single competitor may violate section 1 if it harms competition. See D & S Redi-Mix v. Sierra Redi-Mix & Contracting Co., 692 F.2d 1245, 1249 (9th Cir.1982); Kaplan, 611 F.2d at 291. The district court therefore abused its discretion in instructing the jury on the Conrock conspiracy.
 
 C.
 
 52
 Both parties object to issues raised in the state unfair competition pendent claim, Cal.Bus & Prof.Code Sec. 17200, et seq. General Portland argues that the district court erred in allowing the jury to award damages to French if it found a violation of section 17200. General Portland maintains that section 17203 limits remedies available for a violation of section 17200 to injunctive and restitutionary relief. See Cal.Bus & Prof.Code Sec. 17203 (West 1987). Section 17203 provides:
 
 
 53
 Any person performing or proposing to perform an act of unfair competition within this state may be enjoined in any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.
 
 
 54
 In Little Oil Co. v. Atlantic Richfield, 852 F.2d 441 (9th Cir.1988), we held that this statute does not authorize the recovery of compensatory damages by private plaintiffs. We relied, in part, on Chern v. Bank of America, 15 Cal.3d 866, 127 Cal.Rptr. 110, 544 P.2d 1310 (1976), in which the California Supreme Court held that no private damages were available under Cal.Bus. & Prof.Code Sec. 17535 as a remedy for false or misleading statements. Chern interpreted section 17535 as limiting private plaintiffs to injunctive relief and restitution. The remedial scheme provided by section 17535 is virtually identical to that provided by section 17203. Cases before Little Oil specifically held that Chern 's holding with respect to section 17535 applies equally to section 17203. See Kates v. Crocker National Bank, 776 F.2d 1396, 1398 (9th Cir.1985); Meta-Film Associates, Inc. v. MCA, Inc., 586 F.Supp. 1346, 1363 (C.D.Cal.1984).
 
 
 55
 Chern involved a dispute between a bank and a customer based on an allegation of false or misleading business practices. French argues that Chern should not apply to an unfair competition case between business competitors. French claims support for this distinction in a passage from Committee on Children's Television, Inc. v. General Foods, 35 Cal.3d 197, 197 Cal.Rptr. 783, 794, 673 P.2d 660, 671 (1983): "We do not decide, however, whether a plaintiff other than a business competitor can recover damages on a cause of action based on the unfair competition or false advertising law." (Emphasis added.) Although that passage may be read as implying that the plaintiff in a dispute between business competitors may recover damages under both the false advertising and unfair competition statutes, the California Supreme Court held only that a non-business competitor plaintiff had stated causes of action for injunctive relief and restitution. Id. As in Little Oil, we decline to read equivocal dicta in Children's Television as overriding the authoritative language of section 17203. See 852 F.2d at 445. In the case of all private plaintiffs, the statute plainly authorizes only injunctive relief and restitution.
 
 
 56
 We hold that section 17203 authorizes no compensatory damages for private parties. We therefore reverse the verdict and damage award in favor of French on the unfair competition claim. We need not reach the parties' other arguments with regard to this claim.
 
 D.
 
 57
 French argues that the district court erred by submitting particular special interrogatories to the jury regarding French's claim of intentional interference with prospective business advantage. French did not make this objection in the district court. Thus, the objection was waived. See In re Innovative Construction Systems, Inc., 793 F.2d 875, 882 (7th Cir.1986); Bell v. Mickelsen, 710 F.2d 611, 616 (10th Cir.1983); J.C. Motor Lines, Inc. v. Trailways Bus Systems, Inc., 689 F.2d 599, 603 (5th Cir.1982); 5A Moore's Federal Practice p 49.03, at 49-17 (1988); Fed.R.Civ.P. 51. We will not even review the interrogatories for plain error. See Pierce Packing Co. v. John Morrell & Co., 633 F.2d 1362, 1365 (9th Cir.1980) (observing that the Ninth Circuit has not followed the plain error rule in assessing jury instructions in civil cases); Hargrave v. Wellmen, 276 F.2d 948, 950 (9th Cir.1960) (same).
 
 III
 
 58
 Finally, General Portland has requested sanctions for French's alleged misrepresentation of the record on appeal. Although we agree that counsel should make every effort to represent the record accurately, we conclude sanctions are not warranted.
 
 
 59
 No other issue raised requires our specific attention.
 
 
 60
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 
 FARRIS, Circuit Judge, concurring:
 
 61
 Judge Wallace concludes that the trial court's instructions on the restraint of trade claim were erroneous and remands for a new trial. In its briefs before this court, General Portland attempted to defend the challenged instructions. But it spent more time arguing that any error was harmless. General Portland claims that French offered no evidence of anticompetitive effect in a relevant market. Since proof of anticompetitive effect is a necessary element of a rule of reason case, General Portland argues that French's claim must fail regardless of the trial court's instructions to the jury.
 
 
 62
 It is well established that proof of anticompetitive effect is essential to a rule of reason case. See, e.g., Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 487, 97 S.Ct. 690, 696, 50 L.Ed.2d 701 (1977). It is also beyond dispute that General Portland has preserved its objections on this ground by moving for a directed verdict at trial and by filing a cross-appeal from the denial of its motion. If General Portland's argument that French did not introduce sufficient evidence of anticompetitive effect were correct, we would be obliged to affirm. Thus, although he does not explicitly address the issue, Judge Wallace's silence can only be interpreted as a rejection of General Portland's argument. In the interests of fairness to General Portland, the reasons for this holding should be made explicit.
 
 
 63
 French argues that the conspiracy between Conrock and General Portland had an anticompetitive effect in the West Los Angeles concrete market. General Portland is correct in its assertion that French did not attempt to define the relevant market in any of the traditional ways. It did not offer direct economic evidence of the cross-elasticity of demand between concrete and other construction materials, or of the sensitivity of the price of concrete in West Los Angeles to changes in the price of concrete produced elsewhere. It did not have an industry expert take the stand and testify about these matters. It provided only brief and sketchy evidence of topography, traffic patterns and transportation costs which may tend to insulate firms in West Los Angeles from outside competitive pressures.
 
 
 64
 However, French did offer evidence that it was a producer of concrete in West Los Angeles, that the other producers of concrete in West Los Angeles had formed and carried out a sustained price-fixing conspiracy, that there were no producers of concrete in the West Los Angeles area other than French who were not involved in the price-fixing conspiracy, and that the Conrock-General Portland conspiracy had succeeded in eliminating French. French argues that this evidence is extremely probative on the issue of anticompetitive effect.
 
 
 65
 As a purely logical matter, French is unquestionably correct. A price-fixing conspiracy confined to manufacturers of concrete would not have been able to succeed if concrete were not a distinct product market: when the cartel attempted to raise prices, customers would simply switch to sand, brick, gravel or some other construction material. Similarly, a price-fixing conspiracy confined to firms in West Los Angeles would not have succeeded if West Los Angeles were not a distinct geographic market: when the cartel attempted to raise prices, customers would simply take their business to East Los Angeles or San Diego or Phoenix. If a group of firms is able to fix prices, it is because their customers have nowhere else to turn. Every price-fixing conspiracy thus identifies directly, in a real world context, a group of firm which is insulated from outside competitive pressures. That is precisely what conventional market definition evidence attempts to identify artificially, by the collection and interpretation of economic data regarding the relationship between various demand curves, by common sense assumptions about the interchangeability of similar products, and the like.
 
 
 66
 If French's evidence is believed, the only issue is whether the elimination of the only firm in the relevant market not involved in a price-fixing conspiracy had a likely adverse effect on price or output. That question, of course, is virtually circular. So long as French was around, at least some concrete customers in West Los Angeles--those served by French--could hope to pay prices set by market forces rather than by a cartel. When French was eliminated, that partial protection was lost. In addition, the cartel need no longer set its prices low enough to prevent the loss of additional customers to French. Thus, all concrete customers in West Los Angeles will very likely be worse off as a result of the Conrock-General Portland conspiracy. Although French's evidence is not in the familiar forms, it has enough persuasive force to raise a triable issue.
 
 
 67
 There are situations in which antitrust courts will quite properly reject even extremely persuasive evidence for reasons of uniformity, predictability, ease of administration, or the like. In Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227 (1st Cir.1983), for example, the issue was whether pricing below marginal cost but above average cost constitutes predatory or exclusionary conduct under section 2 of the Sherman Act. The First Circuit recognized that a firm maximizes profits in the short run by pricing at the level of marginal cost. Prices below that level raise a strong inference of predation. But while the Sherman Act condemns acts of predation, it is ultimately designed to promote lower prices. Although prices below marginal cost theoretically fall on the wrong side of the line, there is a danger in trying to draw the line too precisely. Courts are fallible. If they err in their quest for theoretical precision, they end up punishing the very conduct the Sherman Act was designed to foster. In Barry Wright, the First Circuit held that the risk of error was so substantial that a court should not concern itself with predatory pricing unless prices fall below average cost and the firm is actually losing money in the short run. Actual losses are a manageable standard which courts can apply with little risk of error.
 
 
 68
 Under similar reasoning, it might be argued that French's evidence, although extremely probative as a purely logical matter, should not be enough to get to the jury. The most familiar and straightforward method of proving a relevant market is to offer direct evidence about product demand, interchangeability of use, transportation costs, etc. See, e.g., United States v. E.I. Du Pont de Nemours & Co., 351 U.S. 377, 395, 76 S.Ct. 994, 1007, 100 L.Ed. 1264 (1977). These are the methods courts are most comfortable administering, and they presumably contain the least risk of error. While there may be exceptional cases where a relevant market can be proven without relying on the traditional methods, recognizing the exception might invite error in a less clear case, and in general might not be worth the trouble.
 
 
 69
 Our holding today is most significant in rejecting this argument. There is evidence in the record of real world pricing behavior which indicates that West Los Angeles concrete manufacturers occupy a distinct market. Requiring plaintiff to assemble economic data or other evidence verifying this observation would invite needless waste; and defining a relevant market through traditional methods is notoriously complicated, expensive and time-consuming.
 
 
 70
 More to the point, evidence of an overlapping price-fixing conspiracy may be more probative and less susceptible to error than the traditional methods of proving anticompetitive effect. The concept of a single "relevant market" is itself an abstraction. Competition is a matter of degree. The demand for Pepsi, for example, may be extremely sensitive to changes in the price of other colas, somewhat sensitive to changes in the price of root beer, and still less sensitive to changes in the price of mineral water. It would be an oversimplification to draw the line at a single point along this continuum. A conclusion that the relevant product market is soft drinks, for example, will be both overinclusive, to the extent that Pepsi and root beer are not perfect substitutes, and underinclusive, to the extent that some Pepsi customers would just as soon drink mineral water. Defining a relevant geographic market involves similar uncertainties. See, e.g., United States v. Philadelphia National Bank, 374 U.S. 321, 360, n. 37, 83 S.Ct. 1715, 1735, n. 37, 10 L.Ed.2d 915 (1963) ("fuzziness would seem inherent in any attempt to delineate the relevant geographical market"). Even perfect knowledge of the relevant cross-elasticities of demand cannot ordinarily resolve questions about market structure with anything approaching scientific certainty. A certain amount of error is built into the process.
 
 
 71
 Moreover, the market definition approach is only an indirect and attenuated way of measuring anticompetitive effect. The ultimate issue in a rule of reason case is whether a challenged practice will produce adverse effects on price or output. See, e.g., FTC v. Indiana Federation of Dentists, 476 U.S. 447, 460, 106 S.Ct. 2009, 2018, 90 L.Ed.2d 445 (1986); National Society of Professional Engineers v. United States, 435 U.S. 679, 690, n. 15, 98 S.Ct. 1355, 1364, n. 15, 55 L.Ed.2d 637 (1977). The only direct way to answer that question is to introduce evidence of actual price increases or reductions in output after the challenged practice. But even if a plaintiff is lucky enough to gather such evidence, he will face the momentous task of proving that the observed price or output effects were not attributable to any one of an infinite number of independent causes: exhaustion of raw materials, increases in labor costs, increases in the price of substitute goods, tax hikes, etc. Situations will arise where a plaintiff is able to meet this burden. See, e.g., Indiana Federation of Dentists, 476 U.S. at 460-61, 106 S.Ct. at 2018-19. But doubtless those occasions will be rare.
 
 
 72
 Courts have developed the market definition approach to proving anticompetitive effect as a way around these difficulties. If, as a practical matter, we cannot show anticompetitive effect from a before-and-after comparison, we might at least be able to predict what the consequences of a given practice will be by examining the context in which the practice occurred. Where the challenged practice results in the elimination of a single firm, the market definition approach predicts likely competitive impact by asking whether the market from which the firm was eliminated was strong enough to bear the loss: Are firms producing similar products effective competitors for the business of the eliminated firm and therefore able to take up the slack (relevant product market evidence)? Can firms in surrounding localities compete in the eliminated firm's territory and therefore take up the slack (relevant geographic market evidence)? Was the eliminated firm fairly small relative to firms not excluded through the market definition evidence, so that the survivors can expand and take up the slack; are barriers to entry insubstantial, so that new firms can enter the market and take up the slack; do conditions within the affected industry make it difficult to exchange price information and enforce collusive agreements, so that the remaining firms will find it hard to aggregate power (evidence of impact within the relevant market)? In short, the "market definition" method tends to prove harm to competition by demonstrating that the ordinary corrective factors of a healthy free market economy are weakened or absent.
 
 
 73
 The crucial point is that neither market definition nor the traditional methods of market definition are essential to proving anticompetitive effect. See Indiana Federation of Dentists, 476 U.S. at 460-61, 106 S.Ct. at 2018-19; Oahu Gas Services, Inc. v. Pacific Resources Inc., 829 F.2d 1471, 1474 (9th Cir.1987); Southern Pacific Communications Co. v. AT & T, 740 F.2d 1011, 1020 (D.C.Cir.1984). Market definition is simply one way of addressing an extremely complicated issue. It is usually the best we can do, but it hardly eliminates the possibility of error.
 
 
 74
 The evidence in this case is more direct than the type usually relied on by antitrust courts. The jury need not make what are necessarily somewhat arbitrary judgments about which group of firms provide a meaningful context for estimating the likely effects of the Conrock conspiracy. The jury need not evaluate complicated evidence about the conditions within that relevant market in order to ascertain whether the elimination of French will leave consumers susceptible to the exercise of market power. French introduced evidence that West Los Angeles concrete manufacturers were already exercising power over price. Whether or not the cartel faced some competitive pressures from other products or other areas, it certainly faced competition from an independent firm producing the exact same product in the exact same area. The elimination of that firm necessarily led to an increase in the cartel's power. Of course, a jury must ultimately decide whether French's evidence is credible. But submitting French's claim to the jury does not entail a substantial risk of error.
 
 
 75
 Nor is there any reason to believe that our holding will be misapplied in future cases. Today's facts are somewhat exceptional. The members of the Conrock conspiracy were unfortunate enough to have directed their actions toward a market which was already dominated by a separate price-fixing conspiracy; because they produced the same product in the same area, French and the members of the price-fixing conspiracy were part of the same market. We have found no decision which has considered this precise situation, but previous cases have addressed analogous issues.
 
 
 76
 In Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990 (9th Cir.1986), the plaintiff argued that the relevant market was limited to "anticipated top-grossing films" in the San Jose area. Plaintiff "did not present direct evidence going to the 'cross-elasticity of demand' between this limited class of pictures and other films." 793 F.2d at 995. However, it did offer evidence that anticipated top-grossing films received national advertising support, were booked in first class theatres, and in general were treated differently than other films. We held that this evidence was sufficient to define the relevant market. Since interested market participants treated and regarded anticipated top-grossing films as occupying a separate market, a jury could conclude that the films occupied a separate market. Id. at 994-95. Similarly, in Ralph C. Wilson Industries v. Chronicle Broadcast, 794 F.2d 1359, 1363-64 (9th Cir.1986), a case presenting a challenge to exclusive television licensing practices, we based our determination of the relevant market primarily on classifications used by the two national television ratings services.
 
 
 77
 The evidence introduced by French falls within the rationale of these cases. Evidence that West Los Angeles concrete manufacturers entered into a price-fixing conspiracy indicates that interested market participants--those in the best position to know--believed that they were insulated from outside competitive pressures. The West Los Angeles concrete manufacturers were, if French's evidence is believed, able to sustain a price-fixing conspiracy. As noted above, firms cannot maintain a price-fixing conspiracy unless they are in fact insulated from outside competition. Under Syufy and Ralph C. Wilson, evidence of price-fixing is sufficient to define the relevant market.
 
 
 78
 On remand the district court can determine whether French may bolster its proof of anticompetitive effect by introducing any of the traditional types of market definition evidence. In reversing and remanding, we merely recognize that French raised a genuine issue of material fact as to anticompetitive effect even though it failed to introduce traditional types of market definition evidence.