62 F.3d 1424
 1995-2 Trade Cases P 71,112
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
E.W. FRENCH & SONS, INC., Plaintiff-Appellant,
v.
GENERAL PORTLAND, INC., Defendant-Appellee.
 No. 94-55525.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 14, 1995.
Decided Aug. 8, 1995.
 
 Before: LAY,* BRUNETTI and RYMER, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 In the 17th year of this lawsuit's life, it has returned to the circuit essentially in the same shape it was before, only older. Last time, we reversed a directed verdict on the claim by E.W. French & Sons, Inc., a maker and seller of ready-mix concrete, that cement manufacturers, including General Portland, Inc., conspired to fix prices because the district court used the wrong evidentiary standard in ruling on admissibility of co-conspirator statements. E.W. French & Sons, Inc. v. General Portland, Inc., 885 F.2d 1392 (9th Cir. 1989) ("French I"). We also reversed judgment in favor of General Portland on French's claim that GP had conspired with French competitors (the "Conrock conspiracy") to put French out of business because the district court erred in instructing the jury that even if the Conrock conspiracy harmed competition, the elimination of a single competitor could never violate Sec. 1. Id. at 1401. The jury had found a conspiracy, but no effect on competition in the relevant market. We further held that the probative value of evidence of two mailing lists in General Portland files which French believed show that GP exchanged price information with competitors and fraudulently concealed its involvement in the alleged cement price-fixing conspiracy, if authentic, should have been left to the trier of fact. Finally we stated that if there were sufficient evidence on remand to go to the jury on the price-fixing claim, that a reasonable juror could conclude that GP denials of price-fixing coupled with use of "plain white envelopes" to mail pricing information to competitors sufficed to show that GP sought fraudulently to conceal the alleged conspiracy. Id. at 1399-1400.
 
 
 3
 On remand, the district court[1] reaffirmed its prior decision to exclude hearsay, considered evidence previously admitted only for a limited purpose, and reaffirmed the price-fixing directed verdict. Before retrial of the rule of reason case, the court granted summary judgment to GP on the footing that French had failed to prove the existence of a relevant antitrust market in ready-mix concrete in the West Los Angeles area. French appeals both decisions, as well as the district court's denial of its motion to amend, brought after final judgment was entered, to present new claims under California law.
 
 
 4
 We have jurisdiction under 28 U.S.C. Sec. 1291. We affirm the summary judgment on French's rule of reason claim and the order denying French's motion to amend. We reverse the directed verdict on the cement price fixing claim and remand for further proceedings. And we would like to see what remains of this case move along expeditiously, by ADR if possible[2] and an early trial if not.
 
 
 5
 * Because it would make French's appeal on the price-fixing claim go away, we first treat General Portland's insistence that the law of the case precludes this court from overturning the directed verdict.[3] It doesn't. While French I obviously frames the remand, the district court considered evidence that it had not considered before: at a minimum, the "plain white envelope" mailing lists (Exhibits 992 and 996) were considered for all purposes whereas before they had been considered only for a limited purpose. Although the order is unclear, we assume from what the district court said that it also considered evidence that had previously been stricken as beyond the period of limitations. We therefore must look afresh at whether the directed verdict may stand.[4]
 
 
 6
 As French recognizes, an inference of conspiracy cannot be based solely on evidence of parallel movements in price or price protection in an oligopolistic market such as the cement market in which GP operated. But it argues that other evidence -- especially the 1970 and 1973 mailing lists in GP's files with the missing "white paper envelope" signal above competitors' names in the latter list; a GP vice president's acknowledgment that he knew about a competitor's price change before it was announced; a meeting of competitors at the Owl Ranch; efforts by a GP competitor to standardize pricing; advance price announcements; and a GP memorandum about price protection -- indicates collusive behavior rather than procompetitive conduct.
 
 
 7
 We examine the evidence through the lens of Matsushita v. Zenith Corp., 475 U.S. 574 (1986), because French's case is essentially circumstantial. Matsushita admonishes that "antitrust law limits the range of permissible inferences from ambiguous evidence in a Sec. 1 case," and that
 
 
 8
 conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of Sec. 1 must present evidence that "tends to exclude the possibility" that the alleged conspirators acted independently. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action....
 
 
 9
 Id. at 588. However, a plaintiff need not present evidence tending to exclude the possibility of unilateral action unless a defendant first shows that its conduct is "consistent with other plausible explanations." In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litigation, 906 F.2d 432, 440 (9th Cir. 1990).
 
 
 10
 Uniformity among the six cement manufacturers in the Los Angeles market in the price of cement to ready-mix dealers, parallel price moves, the refusal of the firms to underbid each other for this business, and the testimony of cement company officials (including Don Muir of General Portland) to that effect, are to be expected as normal incidents of individual self-interest in an oligopolistic market with few competitors and a fungible, undifferentiated product. Independent Iron Works, Inc. v. United States Steel Corp., 322 F.2d 656, 665 (9th Cir.), cert. denied, 375 U.S. 922 (1963); VI Phillip E. Areeda, Antitrust Law paragraphs 1410b, 1430 (1986). As we have held, it is plausible to assert that interdependent parallel pricing behavior can occur when the number of significant rivals in a market is sufficiently small. Coordinated, 906 F.2d at 443 (market comprising 12 defendants). Thus, French's evidence of parallel price moves does not itself support an agreement in violation of the antitrust laws. Wilcox v. First Interstate Bank of Oregon, N.A., 815 F.2d 522, 526 (9th Cir. 1987).
 
 
 11
 Nor does evidence of advance price announcements by the cement manufacturers create a stronger inference of agreement than of independent action. It likewise is not sufficient to infer agreement under Matsushita, as the evidence clearly demonstrates a plausible legitimate reason for the practice: cement customers had to precommit to supply concrete for construction projects at set prices. Cf. Coordinated, 906 F.2d at 448 (publishing prices creates permissible inference of agreement under Matsushita where defendant's customers are captive franchisees and "not free to shop around for their oil").
 
 
 12
 Similarly, the memorandum by which French believes that Jack E. Craddock of Monolith (a GP competitor) instructed his subordinate to "standardize prices" with Monolith's competitors is insufficiently probative of an agreement involving General Portland. The memorandum tells the employee to discuss "the possibility of standardizing invoicing and pricing"; Craddock explained that this meant that prices should be standardized "in hundredweights and tonnage versus barrels." Seeking to standardize the way in which cement was quoted to customers does not tend to exclude the possibility of unilateral action in pricing.
 
 
 13
 We also do not see what the 1973 internal memorandum from GP's Puckett to J.R. Johnson concerning price protection for its customer, Conrock, adds to the mix. It evinces uncertainty at General Portland about competitors' price protection offers to Conrock, and reflects competition between Conrock's cement suppliers for its business, not collusion.
 
 
 14
 An expense report showing that Johnson of GP spent $22.40 on drinks and met with a "Mr. Schooner" (presumably Paul Schoonover who was then president of Monolith) at the Owl Ranch was not admitted as substantive proof of conspiracy and, in any event, does nothing to create an inference of agreement to fix cement prices charged to ready-mix concrete dealers.
 
 
 15
 Finally, the fact that General Portland and Monolith sent out identical pricing announcements on the same day, August 14, 1972, fails to signify anticompetitive behavior since these price announcements followed on the heels of similar moves announced earlier, at different times, by Riverside Cement, California Portland, Southwestern Portland, and Kaiser. GP's announcement and the coincidence of Monolith's same-day announcement are consistent with independent behavior in a legal, but concentrated market. VI Areeda, p 1410b, at 66.
 
 
 16
 Thus, most of French's evidence is insufficient to permit an inference of conspiracy under Matsushita. However, General Portland did not put forward any pro-competitive business justification for mailing price information to its competitors in plain white envelopes, or for redacting that part of the mailing list bearing the "plain white envelopes" legend in the 1972 version. Similarly, General Portland failed to explain the testimony of Jim Tortorice, a former General Portland credit manager, that he heard Johnson state at an internal GP meeting sometime in 1974 or 1975 that he possessed a price announcement from a competitor that had not yet been sent out to customers. While price announcements to customers in advance of effective dates may have had a legitimate business function in this marketplace, General Portland offered no legitimate justification for sharing those announcements with competitors ahead of general distribution. Counsel's suggestion at oral argument that the practice could be explained by the fact that cement companies also purchased cement from each other is unsupported by any portion of the record cited to us. In any event, purchases among cement companies would not explain the inference raised by Tortorice's testimony that GP had its competitors' price announcements in hand before they were generally distributed.
 
 
 17
 Overall, French's case is about as thin as it can be. Its evidence, in the main, is adequately explained as legitimate business conduct raising no reasonable inference of illegal agreement. However, we cannot say the same for the "plain white envelopes" and prior exchange of competitors' price announcements. As we held in French I that a reasonable juror could conclude that GP denials of price-fixing together with the use of "plain white envelopes" to mail pricing information to competitors showed that General Portland sought to fraudulently conceal the alleged price-fixing conspiracy, we are hard pressed not to conclude here that it suffices to create a jury question regarding the existence of the alleged conspiracy itself.
 
 
 18
 We accordingly hold that French's evidence does not permit only one reasonable conclusion, that General Portland was not part of a cement price-fixing conspiracy. The directed verdict on that claim must, therefore, be reversed.
 
 II
 
 19
 French's appeal from the summary judgment on its "rule of reason" claim (that General Portland conspired with Conrock to drive French out of business) turns on whether the district court properly struck the declaration of Wayne T. French which, French submits, affords sufficient evidence of a restraint on trade in the relevant market to go to the jury. The court excluded as hearsay French's statement that Tom Lipman (of Livingston-Graham, a French competitor) told him that concrete producers other than French had agreed to adhere to a fixed discount. French argues that Lipman's statement was admissible under Fed. R. Evid. 804(b) (3) or Fed. R. Evid. 804(b) (5), since Lipman had died and was thus unavailable. However, Rule 804 arguments are waived; French raised them only in its motion for reconsideration after summary judgment, and it does not appeal the denial of that motion. Regardless, excluding Wayne French's account was within the court's discretion, as his version of what Lipman had said changed as the litigation wore on. Certainly we cannot say that the statements French attributed to Lipman so "solidly" inculpate the declarant, United States v. Nazemian, 948 F.2d 522, 530 (9th Cir. 1991), or are so trustworthy, Mutuelles Unies v. Kroll & Linstrom, 957 F.2d 707, 713 (9th Cir. 1992) (Rule 804(b) (5) is not to be used as a new and broad hearsay exception, but rather rarely and in exceptional circumstances), that it was erroneous as a matter of law to exclude them.[5]
 
 
 20
 The court also excluded Wayne French's opinion that removing any one of the independent ready-mix concrete manufacturers in West Los Angeles "as a competitive brake on the high zone prices charged by the integrated producers in West Los Angeles, would ... create an unreasonable restraint on the sales of ready-mix concrete in West Los Angeles." French claims the court erred because lay opinion based on years of experience is admissible. It may be, but not on subjects requiring particularized expertise. French may have considerable expertise and experience in the concrete industry, but he was never shown to have the economics expertise required to opine on what constitutes an unreasonable restraint on trade. Pacific Coast Agriculture Export Assoc. v. Sunkist Growers, Inc., 526 F.2d 1196 (9th Cir. 1975), cert. denied, 425 U.S. 959 (1976), upon which French relies, is not to the contrary; it establishes only that experienced businesspeople may be qualified to project market shares for the purpose of establishing damages in an antitrust case. For these reasons, the district court did not abuse its discretion in rejecting the declaration.
 
 
 21
 We have not been directed to any other substantial evidence of a defined market within which to measure anticompetitive effect, if any. French uses "Southern California," "West Los Angeles," the "Los Angeles basin" and "Los Angeles" somewhat interchangeably. That aside, counsel's suggestion at oral argument that the existence of a relevant market was shown by testimony of the owner of Pearman & Sons, a concrete maker in Gardena, that he "couldn't make any money" hauling concrete to West Los Angeles, falls short of the mark. That a single concrete supplier could not profitably sell in West Los Angeles (however characterized) does not suffice to demonstrate that the West Los Angeles concrete market was sufficiently insulated from all other surrounding suppliers to make it a relevant market within which trade might be restrained. Indeed, French itself occasionally hauled concrete from Hawthorne to West Los Angeles.
 
 
 22
 French's reliance on Pinhas v. Summit Health, Ltd., 894 F.2d 1024 (9th Cir. 1989), aff'd, Summit Health, Ltd. v. Pinhas, 500 U.S. 322 (1991), is misplaced. There, we were concerned with an alleged boycott, where injury to competition is generally presumed, and with the question whether injury to competition had been adequately pleaded for purposes of Rule 12(b)(6) -- not with the question whether sufficient facts have been proved (on the basis of a full trial record) to raise a genuine issue of material fact for purposes of summary judgment. Pearman's testimony does not show that French's removal injured competition by allowing other concrete manufacturers to charge higher prices, or had any other appreciable effect on the market.
 
 
 23
 We therefore hold that the district court correctly concluded that French failed to raise a genuine issue of material fact with respect to the existence of a relevant antitrust market among producers of concrete in West Los Angeles. Summary judgment on the "rule of reason" claim was therefore correctly entered.
 
 III
 
 24
 French argues that the district court erred in refusing leave to amend to allege claims under California law that were "parallel" to its federal antitrust claims. In its motion for reconsideration, filed 16 years after bringing suit and only after final judgment was entered, French asked for leave to assert an "intentional interference" claim under Herron v. State Farm Mutual Ins. Co., 14 Cal. Rptr. 294 (Cal. 1961), and in the alternative to assert a claim for restitution under Cal. Bus. & Prof. Code Sec. 17203.
 
 
 25
 The district court did not abuse its discretion. We recognize that leave to amend "shall be freely given when justice so requires" and the policy underlying Fed. R. Civ. P. 15 is to be applied with "extreme liberality." Morongo Band of Mission Indians v. Rose, 893 F.2d 1074 (9th Cir. 1990). But while under Morongo a two year delay is "not alone enough to support denial," id. at 1079, nevertheless it is "relevant." French's delay here is nearly an order of magnitude longer and unexplained.
 
 
 26
 There is no reason why the Herron claim, based on a 1961 opinion, could not have been brought at the outset of this action. Similarly, French's argument that it needed to wait for Bank of the West v. Superior Court, 10 Cal. Rptr. 2d 538 (Cal. 1992), to bring its Sec. 17203 restitution claim is without basis; French I clearly stated in 1989 that the statute authorizes restitution, 885 F.2d at 1402, and Bank of the West noted that the statute had been held to authorize restitution on quite liberal grounds as early as 1983. 10 Cal. Rptr. 2d at 546.
 
 Conclusion
 
 27
 We affirm the district court's grant of summary judgment to General Portland on French's rule of reason claim and the denial of French's motion for leave to amend. We reverse the district court's grant of a directed verdict to General Portland on French's cement price-fixing claim and remand for further proceedings on that claim.
 
 
 28
 Each side shall bear its own costs.
 
 
 29
 AFFIRMED in part; REVERSED and REMANDED in part.
 
 
 
 *
 Honorable Donald P. Lay, Senior Circuit Judge for the Eighth Circuit Court of Appeals, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 Hon. Terry J. Hatter, Jr., presiding. Thereafter, the action was transferred to the calendar of Hon. Robert J. Kelleher
 
 
 [2]
 The services of the Ninth Circuit Settlement Unit are available and the parties are ordered to meet and confer, and consult with Chief Circuit Mediator David E. Lombardi, Jr., about the prospects of settlement. A status report shall be filed with the district court and this court within 45 days of the date this disposition is filed
 
 
 [3]
 General Portland relies almost entirely on the "law of the case" from French I, and essentially leaves it to us to ferret out its argument related to the facts from earlier briefs that are incorporated by reference. This is contrary to 9th Cir. R. 28-3.2. Moreover, it is not helpful to the court, which is what briefs are for
 
 
 [4]
 French does not appeal the district court's reaffirmed ruling on the inadmissibility of co-conspirator hearsay, so we do not revisit that issue
 
 
 [5]
 Because we do not reverse the exclusion of the French declaration, and because we agree with the district court that the deposition testimony of Mr. Watkins is insufficient to raise a reasonable inference of a concrete price fixing conspiracy (a conclusion with which French does not take issue on appeal), we need not address the merits of the legal theory for which this evidence is intended to provide support: that French could prove a relevant market for purposes of the GP-Conrock conspiracy claim by showing a price fixing conspiracy among West Los Angeles concrete sellers. French I, 885 F.2d at 1402 (Farris, J., concurring). In any event, French has failed to argue the merits of this theory in its briefs to this court